**Thomas MALLETTE,**
**Petitioner-Appellant,**

v.

**Charles J. SCULLY, Superintendent of**
**Greenhaven Correctional Facility,**
**Respondent-Appellee.**

**No. 300, Docket 84–2185.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 17, 1984.
Decided Dec. 28, 1984.

---

Judd Burstein, New York City, for petitioner-appellant.

Debra W. Petrover, Asst. Dist. Atty., Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty. of Kings County, Barbara D. Underwood, Asst. Dist. Atty., Brooklyn, New York, of counsel), for respondent-appellee.

Before NEWMAN, CARDAMONE and DAVIS,* Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal is from the denial of habeas corpus relief in the Eastern District. Defendant, Thomas Mallette, was convicted in New York State Supreme Court for manslaughter in the first degree after a passenger seated in the front seat of his auto shot and killed a 16-year-old Brooklyn youth. Defendant raises two issues on appeal. He claims, first, that his sentence was enhanced because of his refusal to identify his passenger. Second, he argues, since he himself saw no evil, heard no evil and spoke no evil that the evidence of intent before the state court jury was insufficient to support his manslaughter conviction. Neither argument is persuasive. The State court trial judge did not enhance, but merely refused to show leniency when imposing sentence on defendant. The second argument is flawed because the question for the jury is not whether he heard or spoke evil, but whether he had an intent to do evil.

I

Mallette was indicted for murder in the second degree, attempted murder in the second degree and criminal possession of a weapon in the first degree. The first degree manslaughter count on which he was convicted was a lesser included offense to second degree murder. He was also found guilty of attempted murder and the weapons count. The sufficiency challenge is raised only as to the manslaughter conviction.

When defendant appeared for sentencing, the prosecutor asked that the maximum sentence be imposed because of the nature of the crimes and because the defendant, by refusing to identify the killer, had shown no remorse. Defense counsel argued that Mallette should be shown leniency because he had no prior criminal history and was a 29-year-old married man with children. At sentencing, the state trial judge took Mallette's assertion that he feared reprisal at face value, but noted that the jury had rejected Mallette's duress claim. The state judge observed that while Mallette may have been afraid to reveal the man's name:

> it thwarts justice and an innocent boy ... of 16 with no prior record of any kind is dead. And if Mr. Mallette were willing to assist us, to bring the other person to justice I would find it very easy to be reasonable and lenient.

The trial judge emphasized that Mallette was an active participant in the homicide and that he had twice driven his car back to the scene of the original shooting while his passenger attempted to kill the other youths at the scene. Finally, the trial judge noted that Mallette had ample opportunity to escape when stopped later by the police. The sentencing court also commented that the defendant had lied when he claimed not to know his passenger's true identity. Defendant's sentence was imposed concurrently on all counts: 7 to 21 years on the manslaughter and murder

---

* Honorable Oscar H. Davis, United States Circuit Judge for the Federal Circuit, sitting by designa- tion.

counts and a maximum 5 to 15 years on the weapons count. Under New York Penal Law § 70.00, the maximum sentence on the first two counts is .8⅓ to 25 years. The maximum sentence was not imposed, the state judge explained, because Mallette had no previous record. The Appellate Division affirmed Mallette's conviction and the Court of Appeals denied leave to appeal.

Appellant then instituted a habeas proceeding in the United States District Court for the Eastern District of New York before Judge Jack B. Weinstein. The district court judge denied defendant's application for a writ concluding that Mallette failed to raise a constitutional issue that warranted federal intrusion into a state criminal matter.

## II

The scenario for this senseless slaying developed as follows. An unidentified corrections officer referred to as "Eddie" and Mallette had met in a Brooklyn bar five or six times before the night of the fatality. Both were residents of Staten Island. After a number of drinks at the same Tollgate Bar on the night of the killing, the two left in Mallette's green Volkswagen and drove to a park in Brooklyn. They stopped at the corner of Tenth Avenue and 42nd Street. Perez, Martinez and several other youths were sitting on a park bench a few feet away. The youths testified that the occupants of the Volkswagen asked them for cocaine and they responded that they had none and did not know anyone who did. Eddie then summoned Martinez to the car and questioned him again about cocaine. Martinez testified that when he approached the car he observed a gun on Eddie's lap. When Martinez repeated that he knew of no one selling cocaine, Eddie became abusive. Perez and Jiminez then approached the car to see what was happening. As the two came toward Mallette's car, Eddie opened fire. Perez cried out: "I've been shot." After Eddie fired three or four more shots, the Volkswagen sped off. Immediately following the shooting of Perez, Mallette made a U-turn and chased Martinez—who was on foot and running—the wrong way up a one-way street, while his passenger fired out the car window at the fleeing youth. After driving once around the park, Mallette then drove back to the same park corner where the youths were now gathered around their wounded friend, Perez. As the car approached, Eddie opened fire again. After this second shooting spree, Mallette and Eddie drove uptown. Mallette testified that Eddie had said that all the kids in that park "deserved what this kid got." Less than a half hour later, as Perez still was lying in the street with a bullet wound to his stomach, and the other youths were describing the preceding events to police officers, defendant and Eddie returned a third time. When the boys identified the Volkswagen, the police gave chase, but lost defendant's car. Perez died a few days later.

Later, the same morning, while defendant and his passenger were enroute to Staten Island, a police captain stopped them. When Eddie showed a badge identifying himself as a corrections officer, they were allowed to proceed. The same police officer stopped defendant's car again a short while later at the entrance to the Verrazano Bridge. Mallette exited the car and produced his license and registration, while his passenger remained seated inside. Mallette said nothing to the captain about the shooting on either occasion. Still later that morning according to Mallette, Eddie threatened to shoot him and his family if he ever said anything about the incident.

Mallette testified in his own behalf. His defense consisted of adopting a posture of "see no evil, hear no evil and speak no evil." Thus, he testified he stopped his car at the park corner right before the fatal shooting of Perez, because Eddie wanted to, but that he (Mallette) "did not know why" and "did not ask." Although it was a hot summer night and Eddie was wearing only a shirt and trousers Mallette testified that he did not see the gun in Eddie's lap that Martinez had observed because he was "looking straight ahead." He knew that his passenger was a corrections officer.

The gun was of a size and type that policemen ordinarily carry. Mallette says he did not hear Eddie questioning Martinez about cocaine because "he was not listening." Finally, defendant failed to inform the police captain about the shooting because he "didn't have a chance to say anything." The jury in reflecting on Mallette's credibility, knew that he had testified that he knew nothing about Eddie; yet, later in the trial when confronted with an earlier statement that he had made in which he described Eddie as his friend, Mallette admitted that he knew who Eddie was, but was unwilling to reveal his identity. Mallette also claimed that he never went back to the Tollgate Bar after the shooting, this conflicted with the testimony of other witnesses. The prosecution produced a hostile witness who testified that he and defendant drove home together from the Tollgate Bar after the tragic night. Although this witness later recanted the statement, he did acknowledge in his testimony having once told a detective that Mallette had admitted the shooting incident to him.

### III

The first question presented is whether the trial court impermissibly enhanced defendant's sentence because of his failure to cooperate due to his fear of reprisal. Mallette argues that the increased sentence violates due process because it bears no relationship to either the actual crime or the offender. He claims that the prosecution's insistence on his revealing Eddie's name placed him in the position of choosing between the hard life of long term prison if he refused, and the certitude of reprisal if he cooperated.

In *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), the Supreme Court held that a defendant's unexplained lack of cooperation is potentially relevant to his rehabilitation and, thus, may be considered at sentencing. The Court stated that where the failure to cooperate is due to fear of reprisal it would not bear on rehabilitation and "would [merit] serious consideration" by the trial judge.

*Id.* at 559, 100 S.Ct. at 1363. The defendant argues that the "clear implication" of this language is that a trial court cannot enhance the sentence because of defendant's failure to cooperate due to his fear of reprisal. In *United States v. Bradford*, 645 F.2d 115 (2d Cir.1981), we explained:

[T]he sentencing judge, in his discretion, may take into account as a mitigating factor the defendant's voluntary cooperation with the authorities. Nowhere have we suggested that the defendant's refusal to cooperate may be considered in increasing the sentence he would otherwise receive. It is one thing to extend leniency to a defendant who is willing to cooperate with the government; *it is quite another thing to administer additional punishment to a defendant who by his silence has committed no additional offense.*

*Id.* at 117 (quoting *United States v. Ramos*, 572 F.2d 360, 363 n. 2 (2d Cir.1978)) (emphasis added). We must therefore determine whether the state court sentencing judge enhanced Mallette's sentence or merely declined to show him leniency. It is doubtful that a "principled distinction may be drawn between 'enhancing' the punishment imposed upon the petitioner and denying him the 'leniency' he claims would be appropriate if he had cooperated." *Roberts*, 445 U.S. at 557, 100 S.Ct. at 1362. Yet, even though the distinction is somewhat illusory, it is the only rule that recognizes the reality of the criminal justice system while protecting the integrity of that system.

Turning to whether the judge did in fact enhance defendant's sentence, we conclude that the record shows only that the judge declined to show leniency. Whatever indication of enhancement there may be is slight at best. Defendant's principal argument is that his participation in the shooting was minimal and that nothing in his background justified the heavy sentence. He explained to the judge why he could not cooperate and the judge accepted that claim at face value. Nevertheless, as the state judge explained, the jury had rejected

defendant's duress argument, apparently on the grounds that the threat came well after the shooting and even after Mallette had an opportunity to report it and obtain protection from the police. Although it is clear that the jurors were merely finding that Mallette's actions *during the shooting* were not coerced and that such finding is irrelevant to his refusal to cooperate, there still is insufficient indication that the judge enhanced the sentence. Mallette quotes the sentencing judge as saying:

And if Mr. Mallette were willing to assist us to bring the other person to justice, I would find it very easy to be reasonable and lenient.

This comment merely demonstrates the difficulty of drawing a meaningful distinction between enhancing the sentence and declining to show leniency; it surely does not provide constitutional grounds for reversal. Moreover, the sentence imposed was within statutory limits. In fact, it was not the maximum. The judge expressly and properly considered the gravity of the offense and the need to protect the public. The circumstances of this case are that after the first shooting Mallette drove Eddie back to the scene of the original crime a second time, Eddie opened fire again, and later Mallette drove back a third time. Obviously, a sentencing court could properly find insufficient ground in these circumstances to extend leniency.

## IV

The more difficult issue is whether the evidence presented before the jury was sufficient to support a conviction of manslaughter. On a sufficiency question

raised in a habeas proceeding, a federal court must assess the historic facts to determine whether the evidence supports the jury verdict. *See Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). The task is to ascertain whether the record evidence on which the trier of fact relied was of sufficient quality to support the verdict. *See Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966). Stated another way, a jury verdict is to be upheld where, taking a view of the case most favorable to the government, there is substantial evidence to support it. *See Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Since it is the trier of fact that weighs the evidence, determines credibility and draws inferences from historic to ultimate facts, a federal court, in analyzing sufficiency, should not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. Immigration and Naturalization Services,* 385 U.S. at 282, 87 S.Ct. at 486. The habeas court is not to substitute its view of the evidence for that of the jury. *Jackson v. Virginia,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89. Instead, it stands in the shoes of the state trial court, and must consider whether a rational trier of fact could properly find or infer that the accused is guilty beyond a reasonable doubt.[1] *See* 2 C. Wright *Federal Practice and Procedure* § 467 (1982). Relevant state law determines in this case whether a

1. The district court judge viewed his role in a habeas corpus proceeding to be different for these purposes than it would be under his federal supervisory powers. Although that was once true, the Supreme Court unequivocally held in *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979), that the standards are identical: a federal habeas corpus court *must consider* not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to allow a rational trier of fact to find guilt beyond a reasonable doubt. Thus, the district court judge incorrectly believed that his judgment was "not

necessarily that of the state judge's." He felt free to say that he probably would not have let the case go to the jury, despite his conclusion that a rational trier of fact could have found guilt from the record evidence beyond a reasonable doubt. Therefore, he denied the petition "on the substantive ground that I don't think there is any case for granting the writ." Despite this inconsistency, we need not remand because we agree with the result reached after examining the record evidence of the state court proceedings, which we are in as good a position to review as the district court.

rational juror could have found the element of intent satisfied.

Defendant contends that no rational trier of fact could have concluded that the prosecution had proved the intent to cause serious physical injury, which is necessary to sustain a conviction of manslaughter in the first degree. Mallette concedes that there was sufficient proof to support his conviction for the attempted murder of Martinez and possession of the gun because he pursued Martinez with his car and facilitated Eddie's second round of shooting by driving back. Defendant argues that there was no proof that he shared his passenger's intent with respect to the initial shooting of Perez. We cannot agree.

What we review here is Mallette's intent immediately preceding the shooting of Perez. Specifically, whether there was sufficient proof to find beyond a reasonable doubt that Mallette, with intent "to cause serious physical injury to another person," caused the death of such person or a third person. *See* N.Y.Penal Law § 125.20 (McKinney 1975). To show intent the government must prove what was in the mind of the accused. Commentators agree that it is seldom possible to present testimonial or direct evidence of an accused's state of mind. Intent as a separate item of proof does not commonly exist. II J. Wigmore *Evidence* § 242 (rev. ed. 1979). Thus, whenever intent is an element of a crime, its existence must be inferred by considering the laws that generally govern human conduct. Because intent is formed in the mind in secrecy and silence and the human mind functions at a speed impossible to measure, a determination of whether a deliberate intent was formed must be drawn from all the circumstances of the case. Circumstantial evidence of this subjective fact is therefore indispensable. 2 C. Wright, *supra*, § 411 (1982). Circumstantial evidence is as persuasive as direct evidence. With each, triers of fact must use their experience with people and events to weigh probabilities. *See Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954); Wigmore, *Evidence, supra*, § 26; C. Wright, *supra*, § 467.

The jury by its guilty verdict found "intent" on Mallette's part preceding the shooting of Perez. We must examine the proof to see whether that ultimate fact can be drawn from the historic facts found in the record. Examining the whole complex of interrelated pieces of circumstantial evidence we are satisfied that there were sufficient facts from which a juror could rationally draw the inference that defendant had the requisite intent to commit manslaughter. These basic facts are established: Mallette and Eddie were seeking cocaine at 4 a.m. and at that time Eddie had a gun out and on his lap in plain view. Mallette knew the gun was there. A rational juror could infer from these facts that the pair intended to get cocaine, even if it required using a weapon. Mallette, within a few moments of the first incident, drove his car the wrong way down a one-way street to facilitate Eddie's shooting at Martinez. Within a short while, he drove to the scene a second time and his passenger again opened fire on the youths. That Mallette's subsequent commission of the crime of attempted murder occurred soon after the intent on which the original charge of second degree murder is based provides strong evidence to support the ultimate conclusion that he intended "serious physical injury" to these youths when Perez was fatally shot.

New York courts have long held that a defendant's actions subsequent to a crime are proper evidence of his guilt. *See People v. Conroy*, 97 N.Y. 62, 80 (1884) (falsehoods and evasions to escape the imputation of crime may be considered by the jury on the issue of evil intent); *People v. Pena*, 50 N.Y.2d 400, 429 N.Y.S.2d 410, 406 N.E.2d 1347 (1980) (defendant's possession of a knife in a brown paper bag 20 minutes after incident where victim said defendant pointed bag at him and threatened to shoot is sufficient evidence to find that defendant possessed a "dangerous instrument" in commission of robbery). Further, it is an elementary principle that defendant's com-

mission of a subsequent crime is admissible to establish intent for a previous and distinct crime if the evidence is material and relevant to the issue. *See People v. Place,* 157 N.Y. 584, 598, 52 N.E. 576 (1899) (evidence that defendant assaulted the deceased victim's father with an axe was admitted as proof of her earlier intent to kill the daughter). This rule applies particularly where the transaction proved is related to the transaction on which the indictment for the crime charged is based. *See People v. Buchalter,* 289 N.Y. 181, 217–18, 45 N.E.2d 225 (1942) (evidence of earlier crime admissible to show intent for crime charged); *People v. Harris,* 306 N.Y. 345, 118 N.E.2d 470 (1954) (defendant's demeanor, inquiries and telephone calls after the murder competent evidence of his intent at the time). Here the defendant concedes his intent for the attempted murder count and it was part of and related to the earlier transaction for which Mallette was found guilty of manslaughter.

A rational trier of fact could have disbelieved Mallette's testimony that he did not see Eddie's gun because he was not looking, did not hear because he was not listening, and did not report the crime because he had no chance to speak. A rational juror could have disregarded that testimony as merely self-serving. We conclude, therefore, that a jury could rationally and properly have inferred that the two friends were engaged in a common criminal enterprise to obtain cocaine and were armed and prepared to do grievous bodily harm in the course of their search.

Accordingly, we affirm the order dismissing defendant's habeas corpus petition.

JON O. NEWMAN, Circuit Judge, dissenting in part and concurring in part:

This habeas corpus petition challenging a state court conviction and sentence for first-degree manslaughter poses two close questions concerning ascertainment of a person's state of mind. One issue concerns the state of mind of the defendant; the other concerns the state of mind of the sentencing judge. I respectfully disagree with the majority in its view that the evidence permitted the jury reasonably to conclude beyond a reasonable doubt that there existed in the mind of the defendant, prior to the crime, an intent to cause the serious physical injury that resulted when his automobile passenger shot the victim. I agree that the sentencing judge permissibly declined to reduce the sentence because of the defendant's unwillingness to name his companion.

1. *State of mind of the defendant.* The prosecution's evidence established that petitioner Mallette drove his passenger, a corrections officer, away from a bar in the early morning hours. It was inferable that they both intended to purchase cocaine. The passenger had a pistol on his lap, where it was observable by Mallette. The car stopped at a street corner, and the passenger inquired of a youth on a park bench whether he had cocaine or knew where it could be obtained. When the youth said no, the passenger asked him to come to the car and continued the conversation. The passenger became abusive in his language, and two of the youth's friends approached the car. At that point the passenger fired shots out the open car window, hitting one of the youth's friends, who subsequently died from the wound. Thereafter, the car engaged in a series of maneuvers that kept it near the group, and the passenger fired additional shots. This subsequent conduct was the basis for the jury's conviction of Mallette on a charge of attempted murder in the second degree, which is not challenged. The issue is whether the evidence permitted the jury to convict for the manslaughter offense.

There is no doubt that evidence of subsequent conduct is admissible to prove prior state of mind. Mallette's subsequent conduct in driving the car to positions from which his passenger, whom he then knew had fired one shot at the youths, could and did fire subsequent shots creates, I acknowledge, a *possibility* that throughout the evening he had an intent to inflict serious physical injury on anyone whom his passenger might encounter in the course of

seeking cocaine. But that possibility is so remote and so unsupported by the evidence in the record that it cannot *reasonably* be found by jurors *beyond a reasonable doubt* to have been an accurate description of Mallette's state of mind prior to the first shooting. Mallette was not charged with nor convicted of felony murder. The crime of purchasing cocaine, unlike robbery or other crimes against the person, is not one that inherently creates a risk that a participant will shoot someone to accomplish the criminal objective. Even if it is assumed that Mallette saw the pistol on the lap of his passenger, he was chargeable at most with knowledge that his passenger might use the weapon for defense, for example, if a potential drug seller tried to steal the passenger's money. Nothing in this record could have alerted Mallette to the risk that his passenger might become so hostile in the course of a conversation with a stranger that he would start indiscriminately shooting through the open car window.

The majority cites cases ruling subsequent conduct admissible on the element of intent. The issue, however, is whether the admissible evidence suffices to permit a verdict according to the requisite burden of proof. A more pertinent precedent from the New York courts is *People v. La Belle*, 18 N.Y.2d 405, 276 N.Y.S.2d 105, 222 N.E.2d 727 (1966), in which the evidence was held insufficient to support a conviction for premeditated murder, even though the evidence showed that the defendant, who had been present at the scene of the crime, had helped the perpetrator dispose of the body and had attempted to remove evidence of the crime.

The jury was entitled to disbelieve Mallette when he testified that he drove the car, after the first shooting, under duress, responding to the commands of his gun-wielding passenger. But I cannot agree that the jury could reasonably find beyond a reasonable doubt that Mallette intended the first shooting to occur.

2. *State of mind of the sentencing judge.* This Circuit has recognized the distinction between taking into account as a mitigating factor at sentencing a defend-ant's cooperation with the authorities and administering additional punishment because of a refusal to cooperate. *United States v. Bradford,* 645 F.2d 115 (2d Cir. 1981). I do not share the majority's view that this distinction is "somewhat illusory," though I acknowledge that doubts about the matter have been significantly expressed. *Roberts v. United States,* 445 U.S. 552, 557 n. 4, 100 S.Ct. 1358, 1362 n. 4, 63 L.Ed.2d 622 (1980). I acknowledge the basis for such doubts, since it is obvious that the defendant who refuses to cooperate often receives a greater sentence than the defendant, under otherwise similar circumstances, who cooperates. Of course, that is true of every defendant whose sentence is greater than that of a defendant with mitigating circumstances. But the issue in such cases is not whether one defendant's sentence is higher than another's; it is whether he has been impermissibly punished. That would occur if the sentencing judge started out with a tentative sentence in mind as appropriate for the offense and the offender and then decided to adjust the tentative sentence upward because of some impermissible factor. But the defendant who does not cooperate has no cause for complaint if he receives the judge's tentative sentence, even though the tentative sentence would have been adjusted downward if he had cooperated. Viewing the issue in this way manifestly puts a premium on what was in the judge's mind in formulating the sentence. However, unlike the state of mind of a defendant in a criminal case, it is not necessary that the state of mind of a sentencing judge be ascertained beyond a reasonable doubt. It is sufficient if a reviewing court can have reasonable confidence, giving considerable deference to the articulated explanation of the sentence by the sentencing judge, that the sentence was not adjusted upward because of an impermissible factor. I agree with the majority that we are entitled to conclude that this did not occur in this case.