Robert RAPETTI, Jr.,
Petitioner-Appellee,

v.

Charles JAMES, Superintendent of Collins Correctional Facility, and Robert Abrams, Attorney General of the State of New York, Respondents,

Charles James, Superintendent of Collins Correctional Facility, Respondent-Appellant.

No. 337, Docket 85-2208.

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1985.
Decided Feb. 14, 1986.

---

Morton N. Wekstein, Yonkers, N.Y. (Wekstein & Fulfree, Yonkers, N.Y., of counsel) for petitioner-appellee.

Lois A. Cullen, Asst. Dist. Atty., Westchester County, N.Y. (Carl A. Vergari, Dist. Atty., Westchester County, Anthony J. Servino, Asst. Dist. Atty., of counsel), for respondent-appellant.

Before PIERCE, MINER and DAVIS,* Circuit Judges.

* Of the United States Court of Appeals for the

PIERCE, Circuit Judge:

In September, 1983, Robert Rapetti, Jr. and a co-defendant were convicted of two counts of Rape in the Third Degree following a non-jury trial before Judge Howard Miller in the County Court, Westchester County. The convictions were affirmed with opinion on appeal, *People v. DiNoia,* 105 A.D.2d 799, 481 N.Y.S.2d 738 (2d Dep't 1984), and leave to appeal to the New York Court of Appeals was denied, *People v. Rapetti,* 64 N.Y.2d 763, 485 N.Y.S.2d 1049, 475 N.E.2d 466 (1984). Petitioner was sentenced to a term of imprisonment of one and one-third to four years. He thereafter sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1982) in the United States District Court for the Southern District of New York (Brieant, Judge). The district court, in an opinion and order dated June 27, 1985, granted the writ holding that the evidence presented at trial could not support a finding that petitioner was guilty beyond a reasonable doubt of Rape in the Third Degree. The district court found that the evidence was insufficient to establish two essential elements: 1) that the victim was incapable of giving consent because of drugs or an intoxicating substance administered to her without her consent and 2) that petitioner was aware of this incapacity. For the reasons set forth below, the order of the district court is reversed.

## BACKGROUND

On Friday, March 19, 1982, at approximately 10:00 p.m., Arlene C., a fifteen year old high school student, went to a discotheque in Mount Vernon, New York, with three fellow students, the petitioner Rapetti, Michael DiNoia and Billy Crosson. At the subsequent state court trial, Arlene testified about the events that transpired. Plans to go to the disco had been made on March 18th when Rapetti, DiNoia and Crosson came to Arlene's house; she confirmed these arrangements with Rapetti who telephoned her on Friday afternoon. That

Federal Circuit, sitting by designation.

night the group drove to the disco in DiNoia's orange car. While they were seated at a table, Arlene ordered a 7-Up. She then got up to talk with a friend, ordered another 7-Up at the bar and returned to the table. Arlene testified that she left the table and went to the bathroom and upon returning she ordered another 7-Up which, like all the others she had drunk that night, tasted and looked like 7-Up. At approximately 11:30 p.m., a friend asked Arlene about the time; Arlene stated that while she told her friend that it was 11:30, her watch looked "foggy." Arlene testified that that was the last event she remembered *clearly* about that night. *See* Tr. at 253–74.

Arlene testified that thereafter she was aware of being in a car, hearing petitioner Rapetti's voice and seeing a pond of ducks which she could identify at the time of trial as the front of the Yonkers Motor Inn which is located in the vicinity of her home. She remembered being pulled up some metal steps and laying down "on something." She heard voices and recognized those of Rapetti and co-defendant DiNoia. Rapetti then told her to "[r]oll over" and she felt a pain in her lower back, stomach, vagina, rectum, and on the left side of her face. She testified that, although not unconscious, she had a sensation of "fading in and out" and " 'did not remember certain parts.' " The next thing of which she was aware was waking up the next morning in her home. Tr. at 275–84.

Billy Crosson testified that on March 16, 1982, in DiNoia's presence, Rapetti said that he was mad at a girl for telling his girlfriend that the girl and he had had sexual relations. Rapetti described the "girl" as "like a whore" and said "she gets drunk all the time [and] she'll do anything." Tr. at 84. Crosson testified that Rapetti said the following:

[Crosson] He said that he wanted—he said he was mad at her, you know, for what she said, and that he wanted to take her out and gang bang her.

\*　　\*　　\*　　\*　　\*　　\*

[by Prosecutor] Did he indicate anything else that he wanted to do about Arlene?

[Crosson] He said he had an idea about drugging her.

Michael Bernardi, a friend of Rapetti and co-defendant DiNoia, testified that on Friday afternoon, March 19, 1982, he was lifting weights at a fitness center when he saw Rapetti and DiNoia. Bernardi testified that, in Rapetti's presence, DiNoia said that he had a date that night with a girl named Arlene and that he intended to "get wasted that Friday night and have a good time." Tr. at 20–22.

The testimony of the witnesses regarding the night of March 19, 1982, varied with respect to the events at the disco, but the witnesses were largely consistent when relating their versions of what transpired at the Yonkers Motor Inn. Crosson testified that at the disco he "was watching [Arlene] order drinks, and to the best of my memory, I thought she ordered a seven and seven." Tr. at 106. He also testified that she was staggering and appeared drunk and was kissing him as well as DiNoia. He did not smell any alcohol on her breath. Another witness testified that between 11:00 and 11:45 p.m., she saw Arlene kissing two boys at the disco. *See* tr. at 591 (testimony of Terry Belluzzi). Bernardi related that he saw Arlene at the disco with Rapetti and that he did not see her with a drink in her hand. Tr. at 31. Frank Treglia told the court that sometime between 10:15 and 10:45 p.m. he had a conversation with Arlene at the disco and that she appeared normal. Tr. at 212.

Bernardi testified that at approximately midnight on March 19, 1982, Arlene left the disco in the company of DiNoia, Rapetti and Crosson, who told Bernardi that they were going to the Yonkers Motor Inn. Bernardi drove there with Chris Mansa, Dave Scicolone, and Robert Chin and saw DiNoia walking up the steps of the inn arm in arm with Arlene who was "supported against him." Tr. at 31–39. Bernardi then entered Room 109. Present in the room were Arlene, Rapetti, DiNoia, Crosson,

Mansa, Scicolone, and Chin. Bernardi testified that while Arlene lay naked on the bed, except for a bra, with her arms at a ninety degree angle and her legs spread, Scicolone, Chin, and DiNoia, got on top of her and had intercourse with her. Arlene lay motionless throughout the entire incident and Bernardi only heard her say "Rob" and "[t]ake me home" as he was leaving. Tr. at 42–56. Bernardi then left with Crosson and Mansa; although he was told that Rapetti also left with him, he had no independent recollection of that fact. Tr. at 60; see also tr. at 188 (testimony of Chris Mansa that he left only with Bernardi and Crosson). Crosson testified similarly except he added that Rapetti had engaged in sexual intercourse with Arlene. Tr. at 129–30. Crosson admitted that during the entire incident he never saw Arlene move from her position on the bed. Tr. at 131. Mansa's testimony was corroborative of much of the prior evidence and he noted that Arlene "sounded like she might have been distressed. She sounded kind of weak. She just said not to leave her there. She wanted a ride home." Tr. at 182–83.

Two maids who worked at the inn testified that in the early morning hours of March 20, 1982, they saw several males carry a girl out of Room 109. The girl was carried over the shoulders of one of the boys and placed in an orange car with a loud muffler. Tr. at 395–97, 464–67. One of these two witnesses identified Rapetti as being among the group leaving the inn with the girl. Tr. at 466. She further testified that the sheets in Room 109 were blood stained. Tr. at 470.

The next sequence of events was described by Arlene and her family. Arlene's father, Anthony C., testified that at approximately 1:30 a.m. on March 20, 1982, he heard a loud muffler outside his home and saw a brown colored car drive away. He then found Arlene lying face forward on the lawn. She appeared dazed and she had a cut under her eye; her blouse was buttoned incorrectly and she was wearing no shoes. She was unable to walk without stumbling or to respond to her father's inquiries about where she had been and what was wrong with her. Tr. at 359–66. Arlene's older sister, Lynn C., testified that at 6:00 a.m. on March 20, 1982, she walked into Arlene's room and found her "hanging off the bed." Tr. at 232. Arlene was described by her sister, Lynn, as slurring her words, staggering and unable to remember the previous night, a state in which she had never seen her sister before. Tr. at 233–35. Lynn testified that when she drove Arlene later that day to see Rapetti at the gas station where he worked, Rapetti laughed at Arlene when asked by her about the night before and said "You left with some other guys and I tried to stop you." Tr. at 240; see also tr. at 290 (testimony of Arlene C.).

On March 21, 1982, Arlene went to a doctor who conducted a physical examination. A tampon that Arlene had inserted at 10:00 p.m. on March 19th had to be removed with forceps because Arlene was unable to remove it on her own. The doctor testified that there was no semen present in the specimens he tested, but he noted that this could be explained by Arlene showering the morning after the incident and by the presence of the tampon which could have absorbed any fluid. See tr. at 335–41 (testimony of Dr. Chin Loy); see also tr. at 520–21 (testimony of Robert Adamo).

Rapetti, DiNoia, Scicolone and Chin were each charged with Rape in the First Degree for engaging in sexual intercourse with a person who was incapable of consent by reason of physical helplessness. N.Y.Penal Law § 130.35(2) (McKinney 1967). Each defendant was also charged with Rape in the Third Degree for engaging in sexual intercourse with a person who was incapable of consent because of mental incapacity. Id. § 130.25(1). Non-age was not charged as a basis for inability to consent. Defendants Scicolone and Chin were acquitted of all charges. Rapetti and DiNoia were each convicted of two counts of Rape in the Third Degree and acquitted of the other two counts.

The state trial judge noted that the mental incapacity required for conviction of third degree rape under N.Y.Penal Law § 130.25, as defined by § 130.00(6), exists when "a person is rendered temporarily incapable of appraising or controlling his conduct owing to the influence of a narcotic or intoxicating substance administered to him without his consent." The court found that the evidence supported a finding that Rapetti and DiNoia intended to administer, and did administer, a narcotic or intoxicating substance to Arlene and that as a result she became mentally incapacitated so that "she was rendered incapable of appraising her conduct, she became unable to judge or appreciate the nature of her conduct, she was unable to judge or understand the act of sexual intercourse with one or more persons." The court found that, during this period of mental incapacitation, Arlene was taken to the Yonkers Motor Inn where the defendants engaged in sexual intercourse with her. The court concluded that "since Arlene [C.] was mentally incapacitated at the time of such sexual intercourse, she did not consent thereto." The court further found that at the time "the defendant DiNoia and the defendant [Rapetti] engaged in sexual intercourse with Arlene [C.], each ... of the said defendants ... were aware that a narcotic or intoxicating substance had been administered to her without her consent and that she was mentally incapacitated."

The Appellate Division affirmed with opinion holding that the indictment as amplified by the bill of particulars was sufficient to inform the defendants of the crimes of which they were accused and that there is no requirement that the indictment specify the precise substance that caused the mental incapacitation. Nor was it necessary for the People to prove who administered the substance. The appellate court upheld the convictions finding that there was "ample proof that the victim had indeed been rendered 'mentally incapacitated.'" Leave to appeal to the New York Court of Appeals was denied.

Thereafter, Rapetti filed the subject petition in federal district court for a writ of habeas corpus. The district judge, in granting the writ, held that "[t]here is insufficient evidence against Rapetti in this trial record to support an inference that the victim was drugged by anyone without her consent.... Dizziness, failure of memory and weakness are all equally consistent with a number of causes other than drugs or alcohol administered without the victim's consent." The district court properly noted that evidence of the presence of a vial of quaaludes on the dashboard of DiNoia's car on the day of the occurrence had been ruled inadmissible against Rapetti and he did not consider this evidence, nor does this court, in reaching a decision.[1] While the district court agreed with the Appellate Division that the indictment was sufficient and held that the statute under which Rapetti was convicted did not impermissibly shift the burden of proof to him on the issue of consent, the court nevertheless granted the writ, holding that the evidence was insufficient "to support a finding beyond a reasonable doubt that the victim was drugged or intoxicated as a result of substances administered without her consent or that Rapetti knew she was incapable of giving consent for that reason."

---

**1.** Crosson testified that while driving to Arlene's house on March 19, DiNoia told him that a vial on the dashboard of DiNoia's car contained quaaludes. At the trial, the judge stated that conversations in which any of the defendants was not present were not admissible against the defendant that did not participate. This general objection applied to the conversation concerning quaaludes, and thus even though the trial judge's ruling was far too broad, as the district judge points out, the trial counsel for Rapetti was "entitled to rely on the court's ruling and proceed as if the presence of Quaaludes at the scene was *not binding or admissible against his client.*" Nevertheless, the New York Appellate Division erroneously stated that "[o]n the night of the incident, appellant DiNoia told Crosson *in Rapetti's presence* that the pills in a box on his dashboard were quaaludes." *People v. Rapetti,* 105 A.D.2d at 801, 481 N.Y.S.2d at 740 (emphasis added). As the district court noted, there is no evidence in the record to suggest that Rapetti was present during this conversation. In any event, we reiterate that we do not consider the evidence of the presence of quaaludes in reaching our conclusion.

## DISCUSSION

The standard for federal habeas review of a claim based on insufficiency of the evidence at a state court trial is well established. "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (citations omitted) (emphasis in original); *see Woodby v. Immigration and Naturalization Serv.*, 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966); *Mallette v. Scully*, 752 F.2d 26, 31 (2d Cir. 1984).

 Under New York law, to sustain a conviction of Rape in the Third Degree, the prosecution must show that the defendant engaged in sexual intercourse with a person who was incapable of consent because of mental incapacity. *See* N.Y.Penal Law § 130.25(1); *id.* § 130.05(3)(c). One is mentally incapacitated if, as a result of a narcotic or intoxicating substance administered without consent, the victim cannot appraise or control his own conduct. *See id.* § 130.00(6). The New York Penal Law provides an affirmative defense if the defendant can show by a preponderance of the evidence that he did not know of the facts or conditions responsible for the victim's condition. *See* N.Y.Penal Law § 130.-10. We need not reach the issue raised by petitioner of whether this law impermissibly shifts the burden of proof as to mens rea onto the defendant since the trial court found and the appellate court agreed that Rapetti was aware of the victim's incapacity. *See* Joint Appendix at 14–18; 105 A.D.2d 799, 481 N.Y.S.2d 738. Furthermore, the relevant statutes dealing with this offense do not require the People to establish *who* administered the substance. Thus, " '[i]t is immaterial that the defendant did not administer, or cause to be administered, the narcotic or intoxicating substance, to the victim. It is enough that it was administered by someone without the victim's consent.' " *People v. DiNoia*, 105 A.D.2d at 802; 481 N.Y.S.2d at 741 (citation omitted). Similarly, there is no requirement that the substance be precisely identified because, as pointed out by the Appellate Division, the conduct involved in this crime is by its nature surreptitious and it will usually be difficult to identify the precise substance administered. *Id.* at 801; 481 N.Y.S.2d at 740.

It is not seriously contested that the petitioner Rapetti engaged in sexual intercourse with the victim on the night of March 19, 1982 at the Yonkers Motor Inn. Thus, the relevant issues before this court are whether a rational trier of fact could have concluded that the victim was mentally incapacitated within the meaning of the New York statute and whether Rapetti was aware of her condition.

 Viewing the evidence, as we must, in the light most favorable to the prosecution, *see Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, we agree with the state trial court that there is "credible evidence" to support the court's findings beyond a reasonable doubt. Significantly, Rapetti told a friend that he "wanted to take [Arlene] out and gang bang her" and that "he had an idea about drugging the girl." *See* p. 87 *supra*. These statements, combined with the evidence which we summarize below, sufficiently establish petitioner's guilt beyond a reasonable doubt. Further evidence which supports this conclusion includes the testimony that (1) at the disco Arlene ordered only 7-Up to drink and left her drinks on the table unattended where they could have been tampered with; (2) just before leaving the disco, she was unable to see her watch clearly or remember the events of the evening with clarity thereafter; (3) at the inn, Arlene lay on the bed in Room 109 without moving while she was mounted by four males, including the petitioner; (4) she was carried out of the motel room over the shoulder of one of the males and petitioner was present at that

time; (5) she was dumped on the lawn in front of her home and was found by her father in a disoriented state; (6) she had no memory of the incident the night before and was disoriented upon awakening; (7) when confronted by Arlene, Rapetti made false statements concerning the incident, *see* tr. of Pretrial Hearing at 28 (testimony of Detective Chiaverini); and (8) a tampon had to be removed with forceps—the presence of a tampon during intercourse is not generally consistent with consensual sexual conduct.

We believe that a rational trier of fact could have concluded from the foregoing that the victim was drugged or made intoxicated without her consent and that petitioner knew of her condition. The district court's conclusion that "[d]izziness, failure of memory and weakness are all equally consistent with a number of causes other than drugs or alcohol" is unassailable; however, these symptoms are also consistent with an intoxicated or drug-induced state upon the evidence adduced at the trial herein.

In reaching our conclusion that the evidence was sufficient to support a verdict of guilty, we emphasize that:

> [t]he task is to ascertain whether the record evidence on which the trier of fact relied was of sufficient quality to support the verdict.... Since it is the trier of fact that weighs the evidence, determines credibility and draws inferences from historic to ultimate facts, a federal court, in analyzing sufficiency, should not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." ... Instead, it stands in the shoes of the state trial court, and must consider whether a rational trier of fact could properly find or infer that the accused is guilty beyond a reasonable doubt.

*Mallette,* 752 F.2d at 31 (citations omitted).[2]

The order of the district court is therefore reversed and the cause is remanded to that court with instructions to reinstate Rapetti's conviction.

stated by the Appellate Division and by the district court.

---

**2.** We also reject the argument of the petitioner that the indictment failed to apprise him of the crimes of which he was charged for the reasons