**UNITED STATES of America, Appellee,**

v.

**Wing KWONG, a/k/a David Kwong, Defendant–Appellee.**

**No. 738, Docket 93–1415.**

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1993.

Decided Jan. 24, 1994.

Vivian Shevitz, New York City (Georgia J. Hinde, of counsel), for defendant-appellant.

Kirby A. Heller, Asst. U.S. Atty., Brooklyn (Zachary W. Carter, U.S. Atty., E.D.N.Y.,

Peter A. Norling, Asst. U.S. Atty., of counsel), for appellee.

Before: PRATT, McLAUGHLIN and JACOBS, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Defendant Wing (David) Kwong appeals his conviction and a combined Guidelines sentence of 293 months (over 24 years) imposed by the United States District Court for the Eastern District of New York (Glasser, *J.*), in connection with two separate indictments. Kwong pled guilty in 1988 to a conspiracy to possess and export munitions without the requisite license, in violation of 18 U.S.C. § 371 (1988), and possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d) (1988). Before he was sentenced, however, Kwong was again indicted, tried and convicted in 1992 of a far more serious offense: attempting to murder an assistant U.S. attorney, in violation of 18 U.S.C. § 1114 (1988 & Supp. IV 1992). Only his second conviction is challenged on this appeal, along with the 293–month sentence imposed as concurrent punishment for both convictions.

On appeal, Kwong raises three issues. First, he contends that the evidence was insufficient to prove his identity as the offender or to prove that he possessed the necessary intent to commit the crime of attempted murder. Second, he argues that the district court improperly charged the jury concerning the definition of the required intent. Finally, he contends that the court erred in calculating his adjusted offense level under the Sentencing Guidelines and in assigning his criminal history category. For the reasons stated below, we conclude that there was sufficient evidence to support the verdict, but that the charge on the intent required for attempted murder was erroneous. We therefore reverse the conviction and order a new trial. We see no need to reach the sentencing issue.

## BACKGROUND

The tale leading up to the convictions here combines the clues of a dime store "whodunit" and the low-tech gadgetry of a James Bond "wannabe." It culminates in the attempted assassination of an assistant United States attorney ("AUSA") by sending her a booby-trapped briefcase. The core of the plot is who did it: the defendant, David Kwong, or his nemesis, Chan Wing Yeung.

In April 1988, defendant David Kwong was arrested after selling 63 machine guns to an undercover agent. He pled guilty to conspiracy to deal in munitions without the proper license and possessing unregistered firearms, and he entered into a cooperation agreement with the government. Kwong was then released to begin working as an informant for the Drug Enforcement Administration ("DEA").

Kwong was a difficult informant. According to his handlers, he displayed an acute anxiety over his impending sentence and, consequently, he pressed to make bigger cases, often promising more than he could deliver. Even his own counsel on appeal characterized him as "something of an irritating 'nudge.'" Appellant's Brief at 7. On one occasion, Kwong called AUSA Catherine Palmer (known to the Asian drug lords as the "Dragon Lady") with his usual complaint: the DEA agents for whom he worked refused to go after any "big cases," including a reputed Chinatown crime figure named Chan Wing Yeung ("Chan"). Palmer's response was to "yell at" defendant, informing him that, as far as she was concerned, the DEA should not be working with Kwong at all. She hung up on him. The DEA eventually washed its hands of Kwong, and in October 1989, he shifted his allegiance to the FBI. As he had done with the DEA, Kwong promised agents that he could provide valuable information about Chan, a target in whom they were already interested. In early 1990, Kwong called FBI Agent Ernest Cavagnaro at his home with some insignificant information about an unrelated case, and then informed the agent that Chan had cash, weapons, and gambling chits in his apartment.

On January 30, 1990 AUSA Palmer received a package through the mail. Providentially, two agents happened to be in her office at the time, and they urged caution in opening the package when she did not recognize who sent it. Unwrapping it gingerly, they spied a briefcase inside of which was a

loaded, sawed-off rifle aimed toward the front of the case. The lid of the briefcase held an ordinary rat trap in its ready-to-snap position. A string connected the rat trap to a nut, which was placed inside a paper clamp, which itself was lodged in the trigger housing. The nut was jammed in, presumably, to prevent the gun from firing while it was in the mail. Once the tension of the lid on the trap was released, the rat trap would spring, jerking the string, which would dislodge the nut from the paper clamp. The wings of the clamp would then open, and the trigger would fire. The gun was loaded and its safety was off. There was testimony that the device was functional and that the gun could have fired through the briefcase.

The inside of the briefcase bristled with ham-handed clues. There was a typewritten address that turned out to be Chan's home. The sawed-off barrel of the rifle was later found in a trash can in lower Manhattan, and inside the barrel was a sales slip made out to Chan by a Connecticut gun shop.

Finding this a trifle too pat, the investigators did not arrest Chan. The defendant continued to furnish "evidence" of Chan's guilt to the point where his continued interest eventually shifted the focus of the inquiry to David Kwong himself.

Evidence was developed that at least from September 1989, Kwong had been impersonating Chan in various places. Thus, he used Chan's credit card to buy jewelry. He also rented a private mail drop and hired an answering service in Chan's name. Equipment that could be used to create counterfeit identification documents was seized from Kwong's apartment, as well as that of his girlfriend. Evidence of Kwong's skillful use of disguises was also presented.

On November 15, 1989, someone bought a Marlin 70P rifle from a gun shop in Connecticut. According to the store owner David Chute, the buyer was an Asian man who identified himself as Chan. The most Chute could say a few months later (in March–April 1990), according to FBI Agent Mary Galligan, was that photos of both Chan and Kwong bore "some resemblance" to the individual who bought the rifle. Chute, however, testified at trial that he had selected only

Chan's photo, and had never suggested that Kwong looked like Chan or anyone else. Moreover, at trial Chute was unable to point to the defendant as someone who might ever have been a customer at the gun store.

Relying on circumstantial evidence, the government went to trial on the theory that David Kwong had the motive to kill AUSA Palmer and the motive to "frame" Chan for it. The theory was that Kwong decided to frame Chan for a "big crime" and then "solve" the case to get generous sentencing credit. Because AUSA Palmer, according to the government's argument, was the "only" person thought to stand in the way of Kwong's freedom (given their testy phone conversation), what better "big crime" for Kwong to solve than her murder. Other evidence, including recorded conversations between Kwong and an undercover officer, demonstrated that Kwong had the requisite skill to commit the crime, including extensive knowledge of weapons, particularly those involving booby traps. Significantly, he had a book explaining how to build a booby trap, using a mouse trap.

The government requested that the jury be instructed that proof of "reckless and wanton conduct on the part of the defendant which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death" could essentially be substituted for proof of an "intent to kill." As the government explained in support of its requested charge:

> [W]e can certainly argue that anyone who would send a device that was really just being held together by one little nut even if they didn't intend for the thing to operate was certainly showing reckless and wanton behavior.

Defense counsel opposed this request, arguing that the government had not been attempting to prove reckless or wanton conduct, but intentional and specific conduct. Judge Glasser overruled this objection, and gave the requested charge. Kwong was then convicted of attempted murder.

Prior to sentencing, Kwong moved to set aside the verdict pursuant to Fed.R.Crim.P. 29, challenging both the sufficiency of the

government's identification evidence and, assuming the government's theory and evidence were somehow deemed enough to place Kwong on the sending end of the supposedly booby-trapped device, the lack of evidence that Kwong ever intended to kill anyone, or that the briefcase device would or was intended to have functioned to kill—as opposed, for example, to frighten—the recipient. Kwong also challenged the jury instruction that permitted the jury to convict him of attempted murder, even if the government only proved that sending such a device was "reckless." The court denied the Rule 29 motion.

In calculating the defendant's offense level under the Sentencing Guidelines, the court started with a base level of 22, and then by various specific offense adjustments arrived at an adjusted offense level of 35. Among the various adjustments was a four-level enhancement for an offense involving a murder for hire, an adjustment that even the government conceded in the district court was not appropriate in this case.

In calculating the criminal history factor in the sentence equation, the court settled on Category III. Finding, however, that this did not adequately reflect the seriousness of Kwong's criminal history, the court, without prior notice to the defendant, bumped the history from III to IV. Kwong was then sentenced at the top end of the Guidelines: 293 months' imprisonment, followed by three years' supervised release and a special assessment of $150.

## DISCUSSION

Kwong mounts a three-pronged attack on his conviction. He argues: (a) that the evidence was insufficient to prove his guilt beyond a reasonable doubt; (b) that the charge on the requisite intent for an attempted murder was erroneous; and (c) that his sentence was improperly calculated under the Sentencing Guidelines.

### A. Legal Sufficiency

■ When reviewing a challenge to the sufficiency of the evidence, this Court must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor. See United States v. Roman, 870 F.2d 65, 71 (2d Cir.), cert. denied, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). To support a conviction, the evidence "'need not exclude every reasonable hypothesis, other than that of guilt.'" United States v. Rivalta, 892 F.2d 223, 228 (2d Cir.1989) (quoting United States v. Carson, 702 F.2d 351, 362 (2d Cir.), cert. denied, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983)) (internal quotation marks omitted). The verdict must be upheld if, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Resto, 824 F.2d 210, 212 (2d Cir.1987) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in Jackson).

■ Kwong argues that the government failed to identify him, beyond a reasonable doubt, as the person who mailed the booby-trapped briefcase. He makes much of the fact that no eyewitness identified him. Of course, there is no rule of law that requires identity to be established by an eyewitness. Identity can be inferred through circumstantial evidence. See United States v. Capozzi, 883 F.2d 608, 617 (8th Cir.1989), cert. denied, 495 U.S. 918, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990).

■ It seems clear that Chan did not commit this crime. He did not speak English, although the person who bought the rifle did. Chan did not know AUSA Palmer, was not under investigation by the U.S. Attorney's Office in the Eastern District of New York, and could hardly have been expected to insert his home address in the briefcase.

The jury could properly find that someone impersonating Chan bought the rifle. There was ample evidence that only one month before the gun was purchased in Chan's name, Kwong had already impersonated Chan by renting a mail drop in Chan's name and by charging jewelry and other items to Chan's American Express card, with a driver's license in Chan's name as identification.

The jury could also properly infer from Kwong's specialized skills, knowledge and experience that he was guilty of the attempted murder. *See United States v. Latorre,* 922 F.2d 1, 8–9 (1st Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 217, 116 L.Ed.2d 175 (1991); *United States v. Fortenberry,* 919 F.2d 923, 925 (5th Cir.1990), *cert. denied,* 499 U.S. 930, 111 S.Ct. 1333, 113 L.Ed.2d 265 (1991); *United States v. Andrini,* 685 F.2d 1094, 1096–97 (9th Cir.1982). There was evidence that Kwong knew how to create false identification documents, a skill the perpetrator had to possess to make the false "Chan Wing Yeung" driver's license. Kwong previously had also altered his appearance to impersonate someone else.

In addition, Kwong had peculiar knowledge of and interest in guns and other weapons. His library included books on weapons, booby-traps and other sabotage devices—not the type of library accumulated by the average citizen. As Thoreau has observed, "[s]ome circumstantial evidence is very strong, as when you find a trout in the milk." Henry D. Thoreau, *Journal,* Nov. 11, 1850.

■ Kwong also assails the sufficiency of the evidence of specific intent. By necessity, intent must usually be proven by circumstantial evidence. *See Mallette v. Scully,* 752 F.2d 26, 32 (2d Cir.1984); *United States v. Sanzo,* 673 F.2d 64, 69 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982). Kwong's specific intent to kill could easily be inferred from the design of the booby trap itself. The gun was loaded, the safety was off, and the trap was set so that the gun would fire once the briefcase was opened. As the government notes, anyone who wished merely to scare or injure Palmer would have taken some precaution to prevent the trigger of the gun from releasing.

### B. *Charging Specific Intent*

■ Murder is defined as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111 (1988 & Supp. IV 1992). Attempts to kill are punishable under 18 U.S.C. § 1113 (1988 & Supp. IV 1992). Although there are no definitions in § 1113, it is settled law that guilt of an attempted murder requires proof that the defendant "must have taken a substantial step towards that crime, and must also have had the requisite *mens rea.*" *Braxton v. United States,* 500 U.S. 344, ——, 111 S.Ct. 1854, 1858 (1991) (citation omitted).

In *Braxton,* a prosecution for attempted murder of a federal marshal, the defendant stipulated that he fired two shots through his front door where marshals with an arrest warrant were standing. Finding the concession insufficient to establish the requisite *mens rea,* the Court wrote:

> Since the statute does not specify the elements of "attempt to kill," they are those required for an "attempt" at common law, see *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952) [holding a statute's failure to mention intent "will not be construed as eliminating that element from the crimes denounced"], which include a specific intent to commit the unlawful act. "Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." 4 C. Torcia, Wharton's Criminal Law § 743, p. 572 (14th ed. 1981).

*Braxton,* 500 U.S. at —— n**, 111 S.Ct. at 1859 n**.

■ Thus, a specific intent to kill is an essential element of the crime for which Kwong was prosecuted. The fact that a deadly weapon was used does not ipso facto prove the specific intent. *See generally Yates v. Evatt,* 500 U.S. 391, ——, 111 S.Ct. 1884, 1891–92 (1991).

■ At the charging conference, the government requested an instruction that proof of "reckless and wanton conduct on the part of the defendant which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death" could serve as proof of an "intent to kill."

As the government explained in support of its request:

> [W]e can certainly argue that anyone who would send a device that was really just being held together by one little nut *even if they didn't intend for the thing to oper-*

*ate* was certainly showing reckless and wanton behavior.

(Emphasis added). The defendant objected to including the notion of reckless indifference in the charge:

[M]y only objection to the charge deals with when your Honor refers to the elements of the crime, the third element.

. . . .

In which, your Honor, the requirement to prove the intent to kill another person would be satisfied if the government proved reckless and wanton conduct on the part of the defendant which grossly deviated from a reasonable standard.

It would seem to me, your Honor, the government has not been attempting to prove a recklessness or wanton conduct, but intentional and specific conduct. And that's my objection.

The government now concedes that *Braxton* and *Yates* require proof of specific intent and that mere recklessness will not suffice. It contends, however, that defendant's objection was obscure and failed to comply with the mandate of Fed.R.Crim.P. 30 that the objection state "distinctly the matter to which that party objects and the grounds of the objection."

While the objection could certainly have been more focussed, we find that it was sufficient to alert the trial court and the government to the serious *Braxton* violation they were about to commit. *See* 2 Charles A. Wright, *Federal Practice and Procedure* § 484, at 699–701 (2d ed. 1982) ("[T]he requirement of objections should not be employed woodenly, but should be applied where its application will serve the ends for which it was designed, rather than being made into a trap for the unwary.").

The court's ruling at the charge conference enabled the government to argue in summation that it did not matter if the jury concluded that the device would not have worked, as it was "enough if you find that [the defendant] acted so recklessly that he was aware of a serious risk of death."

Next, the court reinforced the government's mistaken notion by instructing the jury almost exactly as the government had requested on the element of intent:

[T]he government must prove beyond a reasonable doubt that thi[ ]s defendant acted with malice aforethought.

Malice is a state of mind that would cause a person to act without regard to the life of another person.

And to satisfy that element you must find that the defendant acted consciously with the intent to kill another person.

And the requirement of proof of intent to kill another person would be satisfied if the government proved a reckless and wanton course of conduct on the part of the defendant which grossly deviated from a reasonable standard of care which would make him aware of the serious risk of death.

We are unable to say that the guilty verdict rendered here was surely unattributable to the error. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); *see also Pope v. Illinois*, 481 U.S. 497, 501–04, 107 S.Ct. 1918, 1921–23, 95 L.Ed.2d 439 (1987) (*Chapman* harmless-error analysis applies to jury instruction misstating an element of the offense). Accordingly, we must remand for a new trial.

#### C. The Sentence

Defendant objects to the calculation of the adjusted offense level that the trial judge used. He also objects to the criminal history category IV to which he was assigned. We cannot say that these objections are meritless. Nevertheless, we need not reach these questions because of the salutary practice followed in the Eastern District of reassigning remanded cases to a different trial judge. *See* Eastern District Guidelines for the Division of Business Among District Judges, Rule 50.2(*l* )(1) (1989).

#### CONCLUSION

Although the evidence of the defendant's guilt to attempted murder is not insufficient

as a matter of law, the charge was fatally tainted by an instruction that reckless indifference might serve as a substitute for proof of a specific intent to kill. The defendant is entitled to a new trial.

REVERSED and REMANDED.