UNITED STATES of America,

v.

Jose MUYET, a/k/a "Raze,"
et al., Defendants.

No. S3 95 Cr. 941 (PKL).

United States District Court,
S.D. New York.

Feb. 20, 1998.

Mary Jo White, U.S. Atty., for the Southern District of New York, New York City (Thomas M. Finnegan, Jay Holtmeier, of counsel), for U.S.

Valerie S. Amsterdam, New York City, for Antonio Feliciano.

Brafman Gilbert & Ross, P.C., New York City (Charles A. Ross, of counsel), for Pedro Narvaez.

### *OPINION AND ORDER*

LEISURE, District Judge.

Defendants Pedro Narvaez ("Narvaez") and Antonio Feliciano ("Feliciano") were convicted with their codefendants on April 10, 1997, following a five-month jury trial, of various offenses arising out of their participation in the "Nasty Boys" criminal enterprise, as more particularly described below. Narvaez and Feliciano move the Court pursuant to the Federal Rules of Criminal Procedure, Rules 29, 33, and 34, seeking dismissal of the charges against them based on insufficiency of evidence, a new trial based on claims of Governmental misconduct and ineffective assistance of counsel, and an arrested judgment based on lack of Federal jurisdiction and that the charges were more properly brought in state court. Additionally, Narvaez has moved to have the Court recuse itself from hearing and deciding all post-trial motions, pursuant to Title 28, United States Code ("U.S.C."), section 455(a), based on claims that the Court can no longer make a fair and just determination with respect to these defendants. For the reasons stated below, the motions are denied.

### BACKGROUND

According to the evidence adduced at trial, Jose Muyet, a/k/a "Raze," along with his brother John Muyet, a/k/a "Buddha," operated a drug gang known as the Nasty Boys in the Bronx, New York, for a period of several years. The gang operated from an apartment building known as the Airborne building, and sold both heroin and crack. The Nasty Boys resorted to violence quickly and often to maintain order, stifle competition, and protect their business. Narvaez, a/k/a "Basic", was a member of the Nasty Boys,

and participated in many of the gang's activities. Feliciano, a/k/a "Tony", a/k/a "Guess", a/k/a "Guest", was not a member of the gang, in the sense that he did not sell drugs. Feliciano, Jamie Rodriguez, a/k/a "Jay", and Steven Camacho, a/k/a "Camachito", a/k/a "Spank", a/k/a "Spanky", were hired killers who accepted contracts to kill from the Nasty Boys. The Muyets referred to them as the "freelancers."

The jury convicted Narvaez of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count One of the Indictment),[1] conspiracy to violate RICO, 18 U.S.C. § 1962(d) (Count Two), committing violent crimes in aid of racketeering, 18 U.S.C. § 1959 (Counts Seven to Twelve, Seventeen to Twenty, Twenty-eight, and Twenty-nine), narcotics conspiracy, 21 U.S.C. § 846 (Count Thirty), and illegal use and carrying of a firearm, 18 U.S.C. § 924(c) (Counts Thirty-three, Thirty-four, Thirty-seven, Forty-one, and Forty-two). The jury convicted defendant Feliciano of the RICO charges (Counts One and Two),[2] committing violent crimes in aid of racketeering (Counts Twenty-one, Twenty-three, and Twenty-five to Twenty-seven), and illegal use and carrying of a firearm (Counts Thirty-eight and Forty).

## DISCUSSION

### I. RECUSAL

Defendant Narvaez moves for the Court to recuse itself from the consideration of all post-trial motions submitted by the defendants. 28 U.S.C. § 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In his brief,

Narvaez claims that "the Court's patience was strained on many occasions," and that "the record contains statements by the Court which give rise to a concern on the part of Mr. Narvaez and his codefendants that they will not receive a fair and impartial hearing" on these motions. Narvaez also alleges that the Court repeatedly focused upon the behavior and conduct of the defendants. Specifically, Narvaez points to a statement by the Court that "[t]his is not the first time that the Court has had concern with the conduct of these defendants." Narvaez argues that these statements and events create a reasonable basis to question the Court's impartiality, and asks for the Court's recusal.

■ As the United States Court of Appeals for the Second Circuit explained, "the substantive standard for recusal is whether a reasonable person, knowing all the facts, would conclude that the court's impartiality might reasonably be questioned." *Apple v. Jewish Hospital and Medical Center*, 829 F.2d 326, 333 (2d Cir.1987); *see also United States v. Pitera*, 5 F.3d 624, 626 (2d Cir. 1993). In reviewing a recusal motion, therefore, a court must proceed by "examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988).

■ The Second Circuit suggests broad latitude in a district judge's review of a recusal motion. As the Court observed, "The decision whether to grant or deny a recusal motion ... is a matter confided to the district court's discretion," *Apple*, 829 F.2d at 333, and the district court will be reversed

---

1. As to Count One, the jury found that Narvaez committed the following predicate racketeering acts: conspiracy to murder Angel Luis Rivera, Nelson Pacheco, and Antonio Cruz (act 3(a)); murder of Rivera (act 3(b)); murder of Pacheco (act 4); murder of Antonio Cruz (act 5); conspiracy to murder members of the Wolfpack, another gang (act 6(a)); attempted murder of members of the Wolfpack (act 6(b)); conspiracy to murder members of a rival drug gang (act 9(a)); attempted murder of members of a rival drug gang (act 9(b)); murder of Carlos Sanchez (act 9(c)); murder of Raymond Sanchez (act 10); conspiracy to

murder Radames Vega (act 14(a)); murder of Vega (act 14(b)); and conspiracy to distribute narcotics (act 15).

2. The jury found that Feliciano committed the following predicate racketeering acts: conspiracy to murder Miguel Parrilla (act 11(a)); murder of Parrilla (act 11(b)); conspiracy to murder Alexis and Hermenio Salcedo (act 13(a)); attempted murder of Alexis Salcedo (act 13(b)); and attempted murder of Hermenio Salcedo (act 13(c)).

only for abuse of that discretion. *See United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992). Thus, the *Drexel* court provided a cogent analysis regarding the discretion afforded to district judges in recusal motions:

The judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion. In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case. Litigants are entitled to an unbiased judge, not to a judge of their choosing.

861 F.2d at 1312.

The United States Supreme Court most recently addressed these considerations in the context of section 455(a) in *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). In *Liteky,* the defendants in a criminal case claimed that the law required recusal of the assigned judge because the judge had displayed "impatience, disregard for the defense and animosity" toward the defendants in a prior trial before the same judge. *Id.,* 510 U.S. at 542 (internal quotation marks omitted). In rejecting the defendants' claim the Court stated:

opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible .... *Not* establishing bias or partiality, however, are expressions of impatience, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555–56 (emphasis in original).

In his motion asking for the Court to recuse itself, Narvaez claims that the Court's patience was strained on numerous occasions during the trial and that the Court made statements that call the Court's impartiality into question. As noted *supra,* the Second Circuit standard for recusal is that "a reasonable person, knowing all the facts, would conclude that the court's impartiality would reasonably be questioned." *Apple,* 829 F.2d at 333. Further, *Liteky* requires a court facing an impartiality challenge based on judicial remarks made during trial, and not based on any extrajudicial source, to recuse itself only if the statements at issue "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." 510 U.S. at 555. As neither Narvaez nor any other defendant claims that the Court maintained or revealed any opinions which derived from an extrajudicial source, the question is whether this Court has shown such a high degree of antagonism to the defendants as to make fair judgment impossible.

The Court's statements and conduct that give rise to the defendants' concern do not satisfy the standards for recusal set by the higher courts. While the Court indeed faced occasional times over the five-month trial period when its patience with the defendants (as well as with the Government) was tested, there is nothing in the record, or outside of the record, which can be said to show any "deep-seated favoritism or antagonism" toward these defendants. *Id.* Accordingly, a thorough review of the entire record of the trial demonstrates that there exists no basis upon which a reasonable person could question the impartiality of the Court. Therefore, the Court will not recuse itself from the consideration of defendants' post-trial motions. "A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *Drexel,* 861 F.2d at 1312.

## II. RULE 29 MOTIONS OF NARVAEZ AND FELICIANO

### A. *Legal Standard*

■ When a defendant moves for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the Court must determine, based on all of the relevant evidence, whether a rational juror "might fairly conclude guilt beyond a reasonable doubt." *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972)); *accord United States v. Bloome,* 784 F.Supp. 23, 25 (E.D.N.Y.1992). The Court must resolve all reasonable inferences in favor of the Government, *see Mariani,* 725 F.2d at 865, and resolve all issues of credibility in favor of the jury's verdict. *See, e.g., United States v. Weiss,* 930 F.2d 185, 191 (2d Cir.1991); *United States v. Roldan–Zapata,* 916 F.2d 795, 802 (2d Cir.1990). To succeed on the motion, the defendant[s] must persuade the Court that, "viewing the evidence in the light most favorable to the government, . . . no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997) (quoting *United States v. Taylor,* 92 F.3d 1313, 1333 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 771, 1367 L.Ed.2d 717 (1997)) (internal quotation marks omitted).

### B. *Narvaez's Challenges to His Racketeering Convictions*

#### 1. *"Pattern of Racketeering Activity"*

Defendant Narvaez argues in his motion that the Court should grant him a judgment of acquittal on the RICO and RICO conspiracy counts of the indictment (Counts One and Two), despite the jury's verdict to convict. Narvaez claims that the Government failed to prove any relatedness between the racketeering acts that served as the predicates for

his RICO convictions, and therefore failed to prove that Narvaez engaged in a "pattern of racketeering activity," as required by the RICO statute, 18 U.S.C. §§ 1962(c), (d).

A pattern of racketeering activity, as defined by the RICO statute, requires at least two racketeering acts committed by the defendant within the relevant limitations period.[3] 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). However, the Supreme Court, in interpreting RICO, stated "that while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *see also United States v. Alkins,* 925 F.2d 541, 551 (2d Cir.1991). In a later interpretation of RICO, the Supreme Court stated that "to prove a pattern of racketeering activity . . . a prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (emphasis in original); *see also Alkins,* 925 F.2d at 551; *United States v. Minicone,* 960 F.2d 1099, 1106 (2d Cir.1992).

■ To satisfy the first prong of the *H.J. Inc.* test, that the predicate acts are related, the Government must show both that the racketeering acts relate to each other ("horizontal relatedness"), and that the racketeering acts relate to the enterprise ("vertical relatedness"). *See United States v. Long,* 917 F.2d 691, 697 (2d Cir.1990); *see also Minicone,* 960 F.2d at 1106. Horizontal relatedness exists if the racketeering acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e) (now repealed)); *see also United States v. Simmons,* 923 F.2d 934, 951 (2d Cir.1991); *United States v. Wong,* 40 F.3d 1347, 1374 (2d Cir.1994). Additionally, "Two racketeering acts that are not directly

---

**3.** Section 1961(5) states: "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of the chapter and the last of which occurred within ten years (excluding any period

of imprisonment) after the commission of a prior act of racketeering activity.

The effective date for RICO was October 15, 1970.

related to each other may nevertheless be related indirectly because each is related to the RICO enterprise." *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989).

■ The Government may prove the required vertical relationship between the predicate acts and the RICO enterprise by showing either: (1) that the offense related to the activities of the enterprise; or (2) that the defendant was able to commit the offense solely because of his position in the enterprise. *See Minicone,* 960 F.2d at 1106. The offense need not be in furtherance of the organization to be an act related to the activities of the enterprise. *See United States v. Miller,* 116 F.3d 641, 676 (2d Cir.1997); *see also United States v. Thai,* 29 F.3d 785, 815 (2d Cir.1994).

■ The second prong of the *H.J. Inc.* test requires that the racketeering predicates amount to or pose a threat of continued criminal activity. The concept of continuity is both closed and open-ended, "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241. The Government may show closed-ended continuity by proving a series of related predicate acts extending over a substantial period of time. *See id.* at 242. What constitutes a "substantial period of time" is a concept that by nature is incapable of a rigid definition, but predicate acts which extend only over a few weeks or months, and do not threaten future criminal conduct, do not satisfy the continuity requirement of RICO. *See id.*

■ The requisite continuity is present, though, if the Government establishes that the predicates pose a threat of continued criminal activity. In *H.J. Inc.,* the Supreme Court held that:

> the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.

492 U.S. at 242–43. The Second Circuit emphasized, "Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business *automatically* carries with it the threat of continued racketeering activity." *Indelicato,* 865 F.2d at 1383 (emphasis added). The Government therefore satisfies the continuity prong of the H.J. Inc. test for establishing a "pattern of racketeering activity" if it proves that a defendant committed acts in furtherance of a enterprise that exists for criminal purposes.

Applying these standards to the evidence produced during the Nasty Boys' trial, it is clear that a rational jury could find beyond a reasonable doubt that the predicate acts attributed to Narvaez were horizontally related, vertically related, and continuous. The rational jury therefore could conclude that Narvaez had engaged in a "pattern of racketeering activity," as RICO convictions under §§ 1962(c) and (d) require.

■ Looking first at horizontal relatedness, there are a number of connections that a rational jury could make that would lead to the conclusion that the acts interrelate. First, there is a similarity of participants. Of the thirteen predicate acts which served as the basis for Narvaez's RICO conviction under Count One, Narvaez committed all thirteen with Jose Muyet. Narvaez acted with Julio Matias and Juan Machin in six of the offenses with Narvaez; specifically, the murders of Angel Luis Rivera, Nelson Pacheco and Antonio Cruz, and the attempted murder of members of the Wolfpack. Also, John Muyet and Robert Corona participated with Narvaez and Jose Muyet in the murders of Carlos and Raymond Sanchez and the murder of Radames Vega. Luis Quinones played a role in the murders of the Sanchez brothers as well. Finally, all of the above named gang members, in addition to numerous others, participated in the narcotics conspiracy (Count Thirty).

Besides similarity of participants, there was a similarity of purpose among the predicate acts committed by Narvaez. The rational jury certainly could conclude that the Nasty Boys, including Narvaez, murdered

Rivera, Pacheco, Cruz and the Sanchez brothers to protect the drug business of the Nasty Boys, and that Narvaez, the Muyets and Corona murdered Vega in order to keep a greater share of the Nasty Boys' drug profits.

Finally, the rational jury also could find a similarity in the victims of Narvaez's acts. Each of the victims was someone that the Nasty Boys felt was a threat to their drug enterprise. In sum, there was ample evidence introduced at trial that could lead a rational jury to conclude that the predicate acts committed by Narvaez were related events.

■ Turning next to the requirement of vertical relatedness, there is more than sufficient evidence to allow a rational juror to conclude that Narvaez's acts satisfied the requirements of the RICO statute. Vertical relatedness may be satisfied by a showing that the predicate offenses related to the activities of the enterprise. *See Minicone*, 960 F.2d at 1106. Here, there can be no question that a rational jury could decide that Narvaez's acts related to the activities of the Nasty Boys enterprise. Each of the crimes that served as a basis for Narvaez's RICO convictions could reasonably be described as having been committed to protect the Nasty Boys' drug business and to solidify their control over the neighborhoods in which they operated. Specifically, the jury could reasonably conclude from the evidence that the Nasty Boys killed Rivera, Pacheco and Cruz in order to avoid a dispute with another drug gang; shot at members of the Wolfpack to settle a dispute over neighborhood control; murdered the Sanchez brothers to eliminate competition; and killed Vega so that fellow gang members could retain a higher portion of the Nasty Boys' profits.

Also, the Government may satisfy the vertical relatedness requirement by a showing that the defendant was able to commit the predicate offenses solely by virtue of his position in the enterprise. *See Minicone*, 960 F.2d at 1106. A rational jury could find that Narvaez's position in the Nasty Boys enabled him to commit the thirteen predicate offenses that led to his RICO convictions. It would be reasonable to conclude that the

gang did not simply allow anyone to commit these heinous acts, only those close associates who had earned the trust of the group.

■ Finally, a rational jury could determine that Narvaez's acts revealed a threat of continued racketeering activity. It would be reasonable to conclude that the Nasty Boys existed solely for a racketeering purpose, and acts performed in furtherance of that purpose automatically carry the threat of continued activity. *See Minicone*, 960 F.2d at 1106. A reasonable interpretation of the evidence is that the Nasty Boys existed for several years with the express purpose of making money through the illegal sale of narcotics, particularly heroin. During this time, and in furtherance of the racketeering purposes of the enterprise, Narvaez and his fellow gang members committed many violent crimes, demonstrating a threat of continued racketeering activity.

### 2. *Economic Motive*

■ Narvaez next argues that the Court must set aside his RICO convictions because "[t]he Government failed to prove that the racketeering enterprise alleged in the indictment was motivated by economic gain." The Supreme Court has held, however, that "[n]owhere in either § 1962(c) or the RICO definitions in § 1961 is there any indication that an economic motive is required." *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 257, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). The Court based its ruling on the language of § 1962(c), which makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." The Court then determined that "[a]n enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives." *Id.* at 258. In *Scheidler*, the Court expressly overruled a Second Circuit case, *United States v. Bagaric*, 706 F.2d 42 (2d Cir.1983), which had held that a conviction under § 1962(c) required a showing of eco-

nomic motive. *See Scheidler,* 510 U.S. at 259–60.

Therefore, even though the statute does not require the Government to prove that the Nasty Boys enterprise operated with a financial purpose, there was tremendous evidence from which a rational jury could conclude that not only did the Nasty Boys' activities affect interstate commerce, but that the Nasty Boys did exist for a financial purpose. It would be reasonable to conclude that the Nasty Boys sold thousands of dollars of illegal drugs every day for several years, that the main objective of the gang was to earn profits, and that the members of the enterprise committed numerous violent crimes to protect the Nasty Boys from competition. Accordingly, Narvaez's contentions in this area are without merit.

### 3. *Acts Committed to Maintain or Increase Position in the Nasty Boys Enterprise*

Narvaez challenges his convictions under § 1959, Violent Crimes in Aid of Racketeering Activity, which criminalize engaging in certain activities, such as murder, attempted murder, and conspiracy to commit murder "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, *or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.*" 18 U.S.C. § 1959(a) (emphasis added). "In order to establish that a crime of violence was committed 'for the purpose of ... maintaining or increasing position in' a RICO enterprise, the government is required to prove ... that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise." *United States v. Thai,* 29 F.3d 785, 817 (2d Cir.1994); *see also United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir.1992). A motive sufficient to satisfy the requirements of § 1959(a) exists if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Concepcion,* 983 F.2d at 381; *see also Thai,* 29 F.3d at 817.

From the evidence presented against Narvaez at trial, a rational jury undoubtedly could conclude that Narvaez committed the violent crimes charged because he knew it was expected of him by reason of his membership in the Nasty Boys.[4] Testimony indicated that Narvaez was one of the leaders of the Nasty Boys and associated closely with Jose Muyet, the gang's leader. One of the enterprise's tenets was loyalty to the Nasty Boys, and that meant taking actions to preserve the group's operations. A rational jury could conclude that this tenet of loyalty made members believe that violence was expected of them as members of the Nasty Boys and that Narvaez therefore committed his violent crimes in order to maintain or increase his position in the enterprise.

Looking at the specific crimes of which the jury convicted Narvaez, evidence at trial showed that he met with Jose Muyet and Juan Machin to discuss the resolution of a problem with another gang by murdering Rivera, Pacheco and Cruz, and that Narvaez, after Machin's gun jammed, and at Machin's direction, repeatedly shot the victims until he was sure that they were dead. As to the drive-by shootings of the Wolfpack and the Sanchez brothers, the Nasty Boys determined that disputes with the victims were to be settled with violence, and Narvaez drove the car in both instances. Once the gang's leadership voted to kill fellow member Vega, Narvaez and the other leaders (including John Muyet, who voted to spare Vega) carried out their plan. Given the evidence of the structure of the Nasty

---

4. The jury convicted Narvaez of conspiracy to murder Angel Luis Rivera, Nelson Pacheco and Antonio Cruz, murder of Rivera, murder of Pacheco, murder of Cruz (Counts Seven through Ten); conspiracy to murder members of the Wolfpack and attempted murder of members of the Wolfpack (Counts Eleven and Twelve); conspiracy to murder members of a rival drug gang, and attempted murder of members of a Rival Drug Gang (Counts Seventeen and Eighteen); murder of Carlos Sanchez and murder of Raymond Sanchez (Counts Nineteen and Twenty); conspiracy to murder Radames Vega and murder of Vega (Counts Twenty-eight and Twenty-nine).

Boys, and the circumstances surrounding these acts, a rational jury could conclude that Narvaez committed these crimes either because it was expected of him as a member of the Nasty Boys enterprise or in furtherance of his membership in the Nasty Boys. Accordingly, the rational jury could conclude that Narvaez acted to maintain or increase his position in the Nasty Boys, and Narvaez's challenge to his convictions under § 1959(a) must fail.

### C. *Narvaez's Challenges to His Narcotics Conspiracy Conviction*

The jury convicted Narvaez of narcotics conspiracy (Count Thirty), in violation of 21 U.S.C. § 846. Narvaez challenges this conviction, claiming that the Government failed to prove the existence of a single, all-encompassing conspiracy. According to the defendant, the Government offered evidence only of multiple conspiracies. Narvaez therefore asks the Court to dismiss the narcotics conspiracy count against him.

■ "Whether the government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or, instead has proven several independent conspiracies is a question of fact for a properly instructed jury." *United States v.. Johansen*, 56 F.3d 347, 350 (2d Cir.1995); *see also, e.g., United States v. Sureff*, 15 F.3d 225, 229 (2d Cir.1994); *United States v. Rosa*, 11 F.3d 315, 340 (2d Cir.1993). At the close of trial, the Court issued lengthy and detailed instructions to the jury concerning single versus multiple conspiracies. Defendant Narvaez raises no objections to the instructions in the instant motion. In *Rosa*, the Second Circuit pronounced:

> We cannot disturb the jury's verdict if the evidence, viewed in the light most favorable to the government, could have led a reasonable juror to conclude beyond a reasonable doubt "(1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent."

11 F.3d at 340 (quoting *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1192 (2d Cir.1989)).

■ As stated earlier, the defendants do not claim that the Court did not properly instruct the jury in this case. The issue is therefore whether the evidence supports a finding that the alleged single conspiracy existed, and that Narvaez was a participant. As an initial matter, the essence of all conspiracies remains the agreement. The Government can prove a single conspiracy by showing only that the defendant "agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Washington*, 48 F.3d 73, 80 (2d Cir.1995); *see also Sureff*, 15 F.3d at 229. The agreement need not be explicit, *see Beech–Nut Nutrition Corp.*, 871 F.2d at 1191, and may be inferred from the defendant's participation in the alleged enterprise and consciousness of its general nature and extent. *See United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980). Co-conspirators need not have agreed on the essential details of the conspiracy, but must have agreed on the essential nature of the plan. *See United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir.1990). The goals of co-conspirators are not required to be congruent, but the goals may not be for cross-purposes. *See id.* Also, "a single conspiracy may encompass members who neither know one another's identities, nor specifically know of another's involvement." *Sureff*, 15 F.3d at 230.

■ "[A] single conspiracy is not transformed into multiple conspiracies by virtue of the fact that it may involve two or more phases or spheres of operation . . . ." *Maldonado–Rivera*, 922 F.2d at 963. Nor is a single conspiracy transposed into a multiple conspiracy simply by lapse of time, change of membership, or a shifting emphasis on its locale of operations. *See United States v.. Heinemann*, 801 F.2d 86, 92 (2d Cir.1986) (quoting *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir.1979)); *see also United States v. Bueno–Risquet*, 799 F.2d 804, 813 (2d Cir.1986). A single conspiracy exists where there is "mutual dependence and assistance among the spheres . . . a com-

mon aim or purpose among the participants ... or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger operation where others performed similar roles equally important to the success of the venture." *United States v. Bertolotti,* 529 F.2d 149, 154 (2d Cir.1975) (internal citations and quotation marks omitted)..

Regarding narcotics conspiracies, the Second Circuit has observed that "[m]ost narcotics networks involve loosely knit vertically-integrated combinations." *United States v. Panebianco,* 543 F.2d 447, 452–53 (2d Cir. 1976). If a defendant participates in drug trafficking activities where he knew, or had reason to know, that others were involved in a broader project and that his own benefits probably depended on the success of the entire venture, the jury properly may infer that the defendant agreed to enter a single overarching conspiracy. *Sureff,* 15 F.3d at 230; *see also United States v. Barnes,* 604 F.2d 121, 155 (2d Cir.1979). When advanced plans for the steady and continuous sale and trafficking of narcotics exist, the jury may presume that participants in the scheme know that they are part of a broader conspiracy. *See United States v. Harris,* 8 F.3d 943, 946 (2d Cir.1993); *see also United States v. Moten,* 564 F.2d 620, 624–25 (2d Cir.1977).

■■■ There is no question that a reasonable jury could conclude beyond a reasonable doubt that Narvaez is guilty of narcotics conspiracy. Evidence and testimony showed that the Nasty Boys were a highly-organized narcotics enterprise and Narvaez was one of the gang's leaders. The Nasty Boys existed to sell and traffic narcotics, particularly heroin. To say that a reasonable jury could find that the Nasty Boys enterprise was a single overarching conspiracy is an understatement. Finally, Narvaez was a leader within the Nasty Boys and was a close and trusted associate of Jose Muyet, the head of the gang. A rational jury certainly could determine from the evidence presented that Narvaez participated in the conspiracy with a consciousness of its general nature and extent.

■■■ Narvaez also challenges his narcotics conspiracy conviction on grounds that the Government did not prove that he was a "distributor" under the terms of the Controlled Substances Act (specifically 21 U.S.C. §. 841). Instead, he claims that the Government proved only that he was a "retailer," and that the Court must dismiss the narcotics conspiracy count. This challenge has no merit whatsoever. Section 841(a) provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense or possess with intent to manufacture, distribute, or dispense, a controlled substance." § 841(a)(1). Within the Controlled Substances Act, "distribute" means "to deliver (other than by administering or dispensing) a controlled substance." § 802(11). Section 802(8) defines "delivery" as "the actual, constructive, or attempted transfer of a controlled substance." "Administer" means "the direct application of a controlled substance to the body of a patient or research subject by (A) a practitioner ... or (B) the patient or research subject at the direction and in the presence of the practitioner." § 802(2).. Section ·802(10) defines "dispense" as "to deliver a controlled substance to an ultimate user or research subject ... by a practitioner." "Practitioner" means "a physician, dentist, veterinarian, scientific investigator, pharmacy, hospital, or other person licensed, registered, or otherwise permitted by the · United States ... to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research."

The application of these definitions to Narvaez's conduct clearly shows that Narvaez's argument has no basis. The evidence presented at trial could lead a reasonable jury to conclude that Narvaez transferred controlled substances to other individuals. Since Narvaez does not fall into the definition of "practitioner," § 841 proscribes the conduct in which he engaged. Accordingly, his conviction stands.

### D. *Narvaez's Challenge to His Firearms Convictions*

The jury convicted Narvaez of five violations of 18 U.S.C. § 924(c), which prohibits

the use and carrying of a firearm during and in relation to any crime of violence or drug trafficking crime (Counts Thirty-three, Thirty-four, Thirty-seven, Forty-one, and Forty-two).[5] Narvaez asks the Court to dismiss the firearms counts because the weapon taken from him did not match any of the ballistics evidence collected from any of the crimes charged in the indictment. According to Narvaez, "This must give rise to an inference that the government's proof of use, in general, is flawed and tainted."

To gain a conviction under § 924, the government must show that a defendant either used or carried a firearm during or in relation to a crime of violence or a drug trafficking crime or aided and abetted another's use or carrying of a firearm during or in relation to a crime of violence or a drug trafficking crime. The Supreme Court clarified the "use" prong of § 924(c) in *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), holding that § 924 "requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Bailey*, 116 S.Ct. at 505 (emphasis in original).

The Government did not produce the firearm[s] allegedly used by Narvaez during the commission of his crimes, an omission upon which Narvaez relies heavily. However, recovery of the weapon[s] or its production at trial is not a requirement for a conviction under § 924(c). The Government has met its burden so long as the Government offers testimony from which a jury could infer that a defendant used a firearm in the predicate offense. *See United States v. Patino*, 962 F.2d 263, 265 (2d Cir.1992); *see also United States v. Castillo*, 924 F.2d 1227, 1230 (2d Cir.1991). At trial, numerous witnesses testified that Narvaez either personally discharged a firearm during the commission of the predicates or assisted others by providing them a firearm or driving them to the location where shootings occurred.

While the gun seized from Narvaez did not match the ballistics evidence, this does not preclude a § 924(c) conviction. The voluminous trial testimony concerning Narvaez's participation in a number of crimes was sufficient to cause a reasonable jury to conclude that Narvaez committed the firearms offenses charged in the indictment.

### E. Feliciano's Challenges to His RICO Convictions

The jury convicted Defendant Feliciano of violation of 18 U.S.C. §§ 1962(c) and (d), violation of RICO and conspiracy to violate RICO (Counts One and Two). Feliciano now moves the Court to set aside both convictions, contending that the Government failed to show that Feliciano participated in the "operation or management" of the Nasty Boys enterprise.

#### 1. § 1962(c)

In *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that in order to prove that a defendant is guilty of racketeering in violation of § 1962(c), the Government must prove that he participated "in the operation and management of the enterprise." Although liability under § 1962(c) is not limited to "those with primary responsibility for the enterprise's affairs," the "operation and management" test requires that a defendant play "some part in directing the enterprise's affairs." *Id.* at 179. The Court noted that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management," but it expressly declined to reach the question of "how far § 1962(c) extends down the ladder of operation." *Id.* at 184 & n. 9.

The Second Circuit has clarified what satisfies the "operation and management" test. The defendant must have some role in directing the affairs of the organiza-

**5.** Specifically, the jury convicted Narvaez under § 924(c) for using and carrying a firearm in connection with the murders of Angel Luis Rivera, Nelson Pacheco and Antonio Cruz; the murders of Raymond and Carlos Sanchez; the mur- der of Radames Vega; the attempted murders of members of the Wolfpack; the attempted murders of members of a rival drug gang; and the narcotics conspiracy.

tion, but this element of direction "requires less than 'significant' control over the enterprise." *United States v. Viola*, 35 F.3d 37, 41 (2d Cir.1994). In *Viola*, the Second Circuit reversed the defendant's conviction when the jury instruction was erroneous and the evidence failed to show that he operated or managed the enterprise.

> The entirety of the proof with respect to Formisano showed that, acting under Viola's instructions, he transported some stolen beer and lamps to buyers and returned most of the proceeds from the sales to Viola. In contrast with other defendants, Formisano's participation was limited to these two acts which were undertaken without the exercise of appreciable discretionary authority. Viola was the kingpin of the operation who was contacted by drug owners and who would decide how best to remove the drugs from the docks. Viola and the other defendants also decided to whom to sell stolen goods, and for how much. Formisano, on the other hand, was not consulted in the decision-making process and exercised no discretion in carrying out Viola's orders. There was no evidence that he was even aware of the broader enterprise.

*Id.* at 43. The Second Circuit has affirmed convictions when even though the jury instructions were erroneous, the evidence demonstrated that the defendant or defendants played "some part in directing the enterprise's affairs." *See United States v. Workman*, 80 F.3d 688, 695, 697–98 (2d Cir.), *cert. denied*, 117 S.Ct.; *see also United States v. Masotto*, 73 F.3d 1233, 1238, 1239 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996); *United States v. Wong*, 40 F.3d 1347, 1372–74 (2d Cir.1994); *Thai*, 29 F.3d at 816.

The narrow issue presented here is whether the Government has produced sufficient evidence to convince a rational jury beyond a reasonable doubt that Feliciano participated in the operation or management of the Nasty Boys enterprise. The Government concedes that Feliciano was not a member of the Nasty Boys, in the sense that he was not involved in selling the gang's drugs. However-

er, the Government contends that Feliciano closely associated with the enterprise and played an integral role in its activities. Defendant Feliciano argues that the evidence shows that he was an independent contractor, a killer for hire, who played no role in directing the enterprise as required by *Reves*.

Viewed in the light most favorable to the Government, the evidence shows that Feliciano began to associate with the Nasty Boys in late 1991 or early 1992. In 1992, Feliciano was in possession of a gun and was present during a conversation regarding the Nasty Boys' dispute with the Wolfpack. Feliciano later shot "Baby A," a member of the Wolfpack, and ran into the Nasty Boys' building. On April 4, 1993, Steven Camacho, Jaime Rodriguez and Feliciano came to the Nasty Boys' headquarters, the Airborne building, and met with Jose Muyet. When Muyet stated that the Nasty Boys had been involved in a drive-by shooting, Camacho and Feliciano indicated that Al, one of the victims, deserved it. Muyet then informed Camacho, Rodriguez, and Feliciano that there was a contract out on Miguel Parrilla, whom Camacho, Rodriguez, and Feliciano recently had encountered. At some later time, Feliciano returned to the building with Jose Muyet, who ordered Robert Corona to get a pistol for Feliciano. Later that night, John Muyet approached Corona and asked him to take the contract on Parrilla. Muyet indicated that the "freelancers", Camacho, Rodriguez, and Feliciano, wanted the job.

At some point, James Albizu attended a meeting with Camacho, Rodriguez, Feliciano and Alex.[6] At this meeting, the group discussed the plan to murder Parrilla. Parrilla arrived later and got into a car with Camacho and Albizu. Rodriguez, Feliciano, and Alex got into another car. They drove to a location near the Deegan Expressway where they all exited the vehicles. Parrilla walked off with Rodriguez, Feliciano and Alex. Although Feliciano was supposed to kill Parrilla, Alex shot and killed Parrilla. After the murder, Corona saw Jose Muyet give money

---

6. The full name and identity of "Alex" is unclear.

to Feliciano, who then divided it between himself, Camacho, and Rodriguez.

Shortly after this incident, Jose Muyet approached Camacho and Feliciano regarding a contract on Luis Quinones. Those three, along with Corona got into a van and drove to Quinones' apartment. All four carried weapons at the time. Muyet and Feliciano knocked on Quinones' door, but no one answered.

In June of 1993, the Nasty Boys wanted to keep some Dominican men, the Salcedo brothers, from taking over Carmen's Grocery store in the Airborne building. John Muyet suggested to his brother that they get the "freelancers", Feliciano, Camacho, and Rodriguez, to take care of the job. Sometime thereafter, Camacho and Feliciano took the job. They shot at the Dominicans and yelled at them to get out of the area. After the shooting, Camacho and Feliciano fled into the Airborne building. The Nasty Boys later paid Feliciano and Camacho for the shooting.

In sum, the evidence demonstrates that although Feliciano was not a member of the Nasty Boys in the sense that he did not sell the gang's drugs, he was intimately involved in their illegal activities. Feliciano attended meetings, some with the leaders of the Nasty Boys, some at the Nasty Boys' headquarters, where the gang planned murders and other violent crimes. Feliciano eventually participated in carrying out these crimes and exercised discretion when committing them. Additionally, Feliciano clearly was aware of the existence and nature of the Nasty Boys enterprise. A rational jury could infer from the evidence that Feliciano helped plan these crimes, and thus played some role in the operation, management, or direction of the enterprise.

### 2. § 1962(d)

Feliciano also objects to his conviction under § 1962(d), conspiracy to violate RICO. The defendant claims that *Reves* requires that in order to prove participation in a

RICO conspiracy, the Government must establish that the defendant is of the class of persons capable of committing the underlying substantive RICO offense. This argument ignores the clearly settled law of the Second Circuit, and is meritless.

"A defendant can be guilty of conspiring to violate a law, even if he is not among the class of persons who could commit the crime directly." *Viola*, 35 F.3d at 43; *see also United States v. Quintanilla*, 2 F.3d 1469, 1485 (7th Cir.1993). "The RICO conspiracy charge is proven if the defendant 'embraced the objective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance thereof." *Viola*, 35 F.3d at 43 (quoting *United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir.1986)). The issue is therefore whether the Government produced evidence sufficient to convince a reasonable juror beyond a reasonable doubt that Feliciano knowingly associated with the Nasty Boys enterprise by agreeing to commit the predicate acts. *See Viola*, 35 F.3d at 44; *see also United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989).

The voluminous evidence at trial indicated that Feliciano was intimately aware of the nature of the Nasty Boys enterprise. There is abundant proof that he conspired to participate in the gang's pattern of racketeering. Under the applicable standard for liability for RICO conspiracy, a rational jury easily could find that Feliciano satisfies the elements of § 1962(d).[7] Accordingly, Feliciano's motion to overturn his conviction for RICO conspiracy is denied.

### F. Feliciano's Challenges to His Convictions Stemming From the Shooting of the Salcedo Brothers

Feliciano contends that the Court should set aside his convictions relating to the conspiracy to murder, the attempted murders and the assaults of the Salcedo brothers (Counts Twenty-five through Twenty-seven),

---

7. Additionally, there is evidence sufficient to convince a rational juror of Feliciano's culpability even under the heightened standard that he urges this Court to adopt. The jury convicted Feliciano of violation of § 1962(c), concluding that the defendant is among the class capable of the offense, and this Court determines, *supra* at 516, that a rational jury could reach such a conclusion.

as well as the RICO and firearms offenses predicated on those convictions (Counts One, Two and Forty). The defendant urges the Court to take this action because he claims there was insufficient evidence that (1) he intended to kill the Salcedo brothers; (2) he was promised or received payment for the shootings; or (3) he caused the Salcedo brothers serious physical injury.

### 1. *Intent to Kill the Salcedo Brothers*

 The charges of conspiracy to murder and attempted murder require proof of an intent to kill. *See United States v. Kwong*, 14 F.3d 189, 194 (2d Cir.1994), *cert. denied*, 517 U.S. 1115, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996). Indeed, the Court specifically instructed the jury that it had to find proof of an intent to kill before it could properly return a guilty verdict against Feliciano.

The Government may prove intent to kill by a statement from the defendant, though such an admission is not necessary. The jury nearly always must infer proof of intent from circumstantial evidence. *See, e.g., Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir.1984); *United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.1982). "The absence of an express declaration on defendant's part that he intended to kill the victim is not fatal to such conclusion, since the intent to kill may be inferred from the totality of defendant's conduct." *People v. Skian*, 184 A.D.2d 330, 585 N.Y.S.2d 206, 207 (1992). This Court therefore must consider the totality of the circumstances in order to determine if a reasonable jury could conclude that Feliciano intended to kill the Salcedos.

As described *supra*, Robert Corona testified that Jose Muyet hired Feliciano, Rodriguez, and Camacho to perform two previous contract killings. Feliciano and his associates executed Parrilla, but were unable to locate and kill Quinones. The Muyets began to refer to Feliciano, Rodriguez, and Camacho as the "freelancers", because they accepted contract killing assignments from the Nasty Boys but were not actual members of the gang.

Corona testified about John Muyet's plan for the Nasty Boys to assume control of Carmen's Grocery store, located in the Airborne building. When Jose Muyet learned that the Salcedos had gained control of the store, he and other Nasty Boys determined to "hit" the store, which they did a few nights later. The Salcedos did not abandon the store and attempted to rebuild it. When the Muyets discussed the stubbornness of the Salcedos, John Muyet indicated that "it can't stay like this." John Muyet then suggested that they "get the freelancers to take care of" the situation, because the freelancers were "thirsty" for money and would "practically do anything."

On June 3, 1993, Feliciano and Camacho brutally attacked the Salcedo brothers. Jose Muyet instructed someone to wave a flag when the police were not in the area. Corona testified that he saw the Salcedos and a third man leave the store and that the individual began waving the flag. Feliciano and Camacho then crossed the street and began shooting at the men as they closed the front gate to the store. Corona testified that he heard screams and yelling, but that he deciphered Feliciano and Camacho cursing at the Salcedos in Spanish and saying things "[a]bout not coming back." Hermenio Salcedo heard Feliciano say, "Just put the gate down and get out of here," and Salcedo added that the attackers allowed the third man to run away. Feliciano and Camacho then hit Alexis Salcedo and began shooting Hermenio. Corona added that Feliciano and Camacho appeared to pistol-whip the brothers.

Hermenio Salcedo described how, after the attackers shot him in an initial barrage, one of the assailants went to Alexis and shot him. Hermenio testified that at this point he tried to crawl away, but the other attacker shot at him. Then, both attackers turned on Hermenio, shooting him repeatedly. Corona's testimony indicated that Feliciano shot one of the brothers two or three times and that Camacho kicked the other brother as he lay on the ground.

Feliciano and Camacho scurried into the Airborne building when they ceased their attack on the Salcedos. The two brothers lay beaten and bleeding on the ground, Hermenio with six bullet wounds and Alexis with at least one. The police arrived shortly

thereafter and emergency medical services transported the Salcedos to the hospital for treatment.

The next night, Corona overheard the Muyets discussing the payment to Feliciano and Camacho for this shooting. John Muyet commented to Jose Muyet how "thirsty" (cheap) Feliciano and Camacho were. Corona could not recall that exact amount that he heard the Muyets discuss as the payment, but did remember that the amount was such that he (Corona) also considered Feliciano and Camacho "thirsty".

Viewing the evidence presented "in the light most favorable to the government," the facts clearly support the jury's verdict of guilty on the counts of conspiracy to commit murder and attempted murder. The Nasty Boys previously sought to intimidate Carmen, the owner of the store, as well as the Salcedos. The Salcedo brothers refused to abandon the store and remained a problem for the Nasty Boys. The gang, with a history of quick resort to violence, decided to hire the "freelancers", Feliciano, Rodriguez, and Camacho, to handle the problem. The Nasty Boys had previously hired Feliciano and his associates to kill Parrilla and Quinones.

■ Feliciano contends that "use of a gun does not, by itself, prove that the shooters intended to kill the Salcedos." (Feliciano Aug. 11, 1997 Br. at 4, citing *Kwong* ). While this is true, only a minimal additional showing of intent is necessary. *See, e.g., People v. Gonzalez,* 216 A.D.2d 412, 628 N.Y.S.2d 726, 727 (1995) (intent established by defendant's overt acts of brandishing gun, turning it towards the intended victim, and firing it at least twice); *People v. Van Buren,* 213 A.D.2d 504, 623 N.Y.S.2d 906, 907 (1995) (evidence sufficient to establish attempted murder where defendant pointed gun at police officer and fired). In the instant case, Feliciano did much more than simply point a gun at the Salcedos. Feliciano and Camacho ambushed the brothers as they closed the gate on their store, shooting and beating

them in a vicious, unprovoked attack.[8] The defendant and Camacho did not stop shooting after they completed the initial barrage. Instead, they kept shooting at and into their victims, even as the Salcedos tried in vain to crawl or run from the scene. *See People v. Hogan,* 219 A.D.2d 672, 631 N.Y.S.2d 405 (1995) (defendant's intent to cause death of another person is manifest in his act of repeatedly shooting at witnesses at close range); *see also People v. Nance,* 175 A.D.2d 185, 572 N.Y.S.2d 335, 336 (App.Div.1991) (evidence demonstrated attempted murder since defendant repeatedly fired his gun at victim at distance of only several feet); *People v. Milea,* 112 A.D.2d 1011, 492 N.Y.S.2d 650, 652 (1985) (sufficient evidence of defendant's intent to murder when victim shot eight times at close range).

Feliciano argues that because he and Camacho told the victims to go away before the shooting began, and did not shoot the Salcedos in the head, the jury's determination that he (Feliciano) intended to kill the Salcedos is irrational. Once again, this Court will not substitute Feliciano's interpretation of the evidence for that of the jury. Viewing the totality of the circumstances, there can be no question that a reasonable jury could conclude that Feliciano intended to kill the Salcedos. Feliciano was a "freelancer", a hired killer used before by the Nasty Boys. These individuals ambushed the Salcedos and a third man as they left Carmen's Grocery store.[9] Feliciano and Camacho shot Hermenio Salcedo six times and Alexis Salcedo at least once. Additionally, the assailants fired numerous stray rounds at the victims and pistol-whipped and kicked the helpless brothers. A reasonable jury certainly could conclude that Feliciano intended to kill the Salcedos. Thus, the defendant's challenge must fail.

## 2. *Insufficient Proof of Payment*

■ A defendant violates § 1959 if he commits a violent act as consideration for

---

**8.** The Second Circuit stated in *Kwong* that "anyone who wished merely to scare or injure [the victim] would have taken some precaution to prevent the trigger of the gun from releasing." 14 F.3d at 194.

**9.** Feliciano and Camacho allowed the third man to leave, perhaps explaining why the assailants yelled, "Get out of here."

payment, or a promise of payment, from an enterprise engaged in racketeering activity. Feliciano claims that the evidence did not prove that he was promised or received payment for his role in the shooting of the Salcedo brothers. This argument has no basis; a reasonable jury could find that the Muyets promised and paid Feliciano money for the attack.

Corona testified that he overheard John Muyet discuss hiring the "freelancers" to "take care of" the Salcedos. Following the shootings, Corona overheard John Muyet discuss the payment to Feliciano and Camacho. Viewed in the light most favorable to the Government, the evidence presented was sufficient to allow a reasonable jury to determine that Feliciano was promised or received payment for his role in the Salcedo shootings.

### 3. "Serious Physical Injury"

██ Feliciano claims that no reasonable jury could find that he inflicted "serious bodily injury" upon the Salcedos, and the Court must therefore set aside his convictions on those counts of the indictment that charge him accordingly (Counts Twenty-five through Twenty-seven). "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal L. § 10.00(10). Hermenio Salcedo and Corona testified as to the events of the attack, painting a graphic, disturbing portrait of a vicious assault in which Feliciano and Camacho shot, pistol-whipped, kicked, and beat the Salcedos. The victims required medical attention at the scene and the emergency medical services transported them to a hospital for more treatment.

Feliciano argues that because the Salcedos did not testify as to the precise nature of their injuries, and the Government did not provide any expert medical testimony, the Court must dismiss the convictions against

him. In *People v. Staunton,* 190 A.D.2d 703, 593 N.Y.S.2d 534, 535 (1993), the court in affirming a first degree assault conviction said that the circumstances of that case left no doubt that the victim suffered serious physical injury.[10]

The circumstances of this case indicate that a reasonable jury could conclude that the Salcedos suffered serious physical injury. The attack left Hermenio Salcedo with six gunshot wounds and Alexis Salcedo with at least one. The brothers required emergency medical treatment and transportation to a hospital for additional treatment. From this testimony, there was sufficient evidence to believe that the injuries posed a substantial risk of death or caused the Salcedos protracted disfigurement, impairment of their health, and impairment of their legs. Feliciano relies upon *People v. Rojas,* 61 N.Y.2d 726, 472 N.Y.S.2d 615, 616, 460 N.E.2d 1100 (1984), which held that evidence of a gunshot wound, without more, is insufficient to sustain an assault conviction. In this case, the Government presented enough additional evidence to sustain Feliciano's convictions. Feliciano beat, pistol-whipped, and kicked the brothers, who required emergency medical treatment at the scene and transportation to a hospital for more treatment. Thus, the circumstances surrounding the Salcedo shooting provide sufficient evidence for a reasonable jury to conclude that the Salcedo brothers suffered serious physical injury.

### 4. RICO and Firearms Convictions

As ample evidence exists for a reasonable jury to convict Feliciano of conspiracy to murder, attempted murder and assault of the Salcedo brothers, this Court will not set aside Feliciano's convictions. These convictions served as predicates for the RICO and firearms counts of the indictment. Accordingly, the RICO and firearms convictions likewise stand.

### III. Rule 33 MOTIONS NARVAEZ AND FELICIANO

Defendants Narvaez and Feliciano move for new trials pursuant to Rule 33 of the

---

10. In *Staunton,* the defendant shot the victim at close range and the victim required surgery. The Court notes that evidence as to the specific treatment administered to the Salcedos is lack-

ing. However, *Staunton* supports the proposition that the circumstances surrounding an incident can lead a jury to conclude that a victim suffered serious physical injury.

Federal Rules of Criminal Procedure. Defendant Narvaez argues that he is a victim of Governmental misconduct, while both Narvaez and Feliciano claim that they received ineffective assistance of counsel.

### A. *Standard for Rule 33 Motions*

Rule 33 authorizes a district court to order a new trial "if required in the interest of justice." The defendants who ask for a new trial bear the burden of showing the "essential unfairness of the trial." *United States ex rel. Darcy v. Handy*, 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331 (1956). "A district court learning of newly discovered evidence after a conviction will only grant a new trial pursuant to Rule 33 if the evidence is material, noncumulative, and 'would probably lead to an acquittal.'" *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir.1993) (quoting *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir.1981)); *see also United States v. McCarthy*, 54 F.3d 51, 55 (2d Cir.1995). When a defendant alleges that prosecutorial misconduct entitles him to a new trial, he faces a substantial burden because the misconduct alleged must be so severe and significant as to result in the denial of a fair trial. *See Locascio*, 6 F.3d at 945; *see also United States v. Orena*, 32 F.3d 704, 717 (2d Cir. 1994). In evaluating a claim of prosecutorial misconduct, courts consider (1) the severity of the alleged misconduct; (2) the curative measures taken; and (3) the likelihood of conviction absent any misconduct. *See Locascio*, 6 F.3d at 945–46.

Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial in order to avert a perceived miscarriage of justice. *See United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992). The court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of witnesses. *See id.* A court should exercise this discretion sparingly, and motions for a new trial based on the identification of perjured testimony "should be granted only with great caution and in the most extraordinary of circumstances." *Id.* at 1414; *see also United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir.1987). Trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. *See Sanchez*, 969 F.2d at 1414; *see also United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982).

Only in exceptional circumstances may the trial judge intrude upon the jury function of credibility assessment. *See Sanchez*, 969 F.2d at 1414. A defendant arguing for a new trial on the basis of perjured testimony must first demonstrate that a witness committed perjury. *See United States v. Torres*, 128 F.3d 38, 49 (2d Cir.1997); *see also United States v. White*, 972 F.2d 16, 20 (2d Cir.1992). If the prosecution was unaware of the perjury, the defendant also "must show 'that the jury probably would have acquitted in the absence of the false testimony.'" *Torres*, 128 F.3d at 49 (quoting *United States v. Moore*, 54 F.3d 92, 99 (2d Cir.1995)). If the prosecution knew or should have known about the perjury, a court will set aside the conviction "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Torres*, 128 F.3d at 49 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991)).

### B. *Narvaez's Claims of Governmental Misconduct*

#### 1. *Testimony of Juan Machin*

Narvaez again complains of Governmental misconduct in the handling of Juan Machin. Narvaez argues that because Machin testified as to statements made to Machin by Sosa and John Muyet after Machin began to speak to the Government, but before signing a cooperation agreement, Machin was an improper "spy in the defense camp." Narvaez claims that this conduct entitles him to a new trial.

Since Narvaez bears the burden of proving his allegations in the context of this motion, he must demonstrate the essential unfairness of his trial. The defendant has failed to meet this requirement. This Court conducted an extensive mid-trial hearing concerning the circumstances surrounding Machin's cooperation agreement and determined that the Government had done nothing wrong. Furthermore, this Court issued an Opinion in both

oral and written form. Narvaez offers no basis to challenge that ruling. Accordingly, the Government did not improperly place a "spy in the defense camp," and Narvaez's claim fails.[11]

### 2. *Perjury Committed by Government Witnesses*

Narvaez alleges that this Court must grant him a new trial because Government witnesses committed perjury. As explained *supra*, a party alleging perjury must prove that witnesses indeed perjured themselves. Narvaez has made no showing of any perjury by Government witnesses. The defendant has simply pointed to passages of testimony and claimed that they are unbelievable. Determinations of credibility, however, are made by the jury and not Narvaez. This Court will not usurp the jury's function based solely on these bare allegations.

Additionally, even if Narvaez could prove perjury by Government witnesses, this alone is not sufficient to justify a new trial. Absent Government knowledge of the perjury, Narvaez must also show that the jury probably would have acquitted him in the absence of the false testimony. If the defendant proved the Government knew or should have known of the perjury, he still must demonstrate a reasonable likelihood that the false testimony could have affected the judgment of the jury. As Narvaez fails to prove the existence of any perjured testimony, this inquiry is irrelevant. However, the Court notes that none of the testimony of which Narvaez complains has anything to do with him, and the evidence produced at trial against Narvaez was overwhelming. The Court denies Narvaez's claims, as the defendant has not shown the existence of any perjury by Government witnesses.

### C. *Ineffective Assistance of Counsel*

Defendants Narvaez and Feliciano both claim that they received ineffective assistance of counsel and that the Court therefore must grant them a new trial. The Supreme Court stated that in order to show ineffective assistance of counsel, a defendant must prove both (1) that counsel's performance was deficient, by showing that counsel made errors so serious as to not function as the "counsel" guaranteed defendant under the Sixth Amendment to the United States Constitution, and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The proper standard for attorney performance is that of reasonably effective assistance. *See id.* To succeed on an ineffective assistance claim, a defendant must show that counsel's conduct fell below "an objective standard of reasonableness under prevailing professional norms." *See id.* at 688; *see also United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir.1995). In assessing the defendant's claim, the Court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690; *see also Kirsh*, 54 F.3d at 1071. A court evaluating counsel's performance must do so from counsel's perspective at the time of the alleged error and in light of the circumstances. *See Strickland*, 466 U.S. at 689; *see also Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). This is because an assessment of counsel's performance must make every effort "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

Once a defendant shows that counsel acted incompetently, the defendant must also prove that counsel's errors prejudiced him. To prove prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Kim-*

---

**11.** As noted during the mid-trial hearing, Narvaez has no standing to challenge the Government's actions concerning Machin because Machin only testified to conversations with Sosa and John Muyet. Narvaez may not challenge his convictions based on the violation of another's rights. *See United States v. Salvucci*, 448 U.S. 83, 86–87, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

*melman,* 477 U.S. at 381. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

### 1. *Claims by Narvaez*

Defendant Narvaez has submitted a list of twenty-one instances of alleged ineffective assistance of counsel that he argues entitles him to a new trial. Not one of his claims, which come from inside and outside of the record, have any merit whatsoever. Based on a review of the record, it is clear beyond cavil that Narvaez received exceptional representation by the extremely well-qualified and capable Robert Weinstein, Esq. ("Weinstein"), throughout the trial. Indeed, a review of Narvaez's listed claims shows that they are so cryptic as to be nearly indecipherable. In any event, none of Narvaez's arguments indicate that Mr. Weinstein's counsel fell below an objective standard of reasonableness. Also, as noted *supra,* the evidence against Narvaez was overwhelming. The defendant makes absolutely no showing that but for unprofessional errors the result of the proceeding would have been different.

■ Only a handful of Narvaez's claims even merit the attention of the Court. Narvaez claims that counsel did not prepare him to testify and "overruled" his desire to testify. The Second Circuit recently held that the decision to testify "belongs to the defendant and may not be made for him by defense counsel," and that there is "no general obligation on the trial court to inform a defendant of the right to testify and ascertain whether the defendant wishes to waive that right." *Brown v. Artuz,* 124 F.3d 73, 78, 79 (2d Cir.), *petition for cert. filed,* (U.S. Dec. 18, 1997)(No. 97–7198). Narvaez admitted to the Court, however, that Weinstein did prepare the defendant, but advised against testifying. Further, the Court informed Narvaez of his right to testify, and the defendant chose not to exercise his option. As Narvaez made that choice, he may not now complain of ineffective assistance of counsel.

■ Narvaez also argues that Weinstein failed to call numerous witnesses who would come forward and provide exculpatory evidence for the defendant. The defendant fails to offer any affidavits indicating that these witnesses indeed would have testified as Narvaez claims. Additionally, several witnesses testified on behalf of Narvaez in an attempt to establish the same points as these alleged witnesses. Finally, there was clear reason not to call these witnesses, even if they would testify on behalf of Narvaez. For example, no evidence linked Narvaez to the slashing of Machin, so any testimony on the incident would not exculpate him. The authorities arrested Marilyn Torres with Narvaez, so her testimony was subject to attack, as was that of Jaime Rodriguez, convicted of murder and narcotics trafficking and facing a mandatory life sentence. "[T]he tactical decision of whether to call specific witnesses— even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse of professional representation." *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997); *see also United States v. Romero,* 54 F.3d 56, 60 (2d Cir.1995), *cert. denied,* 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 568 (1996). Trial counsel's decisions not to call these witnesses are strategic in nature and are generally unreviewable in the context of ineffective assistance claims. *See Strickland,* 466 U.S. at 690.

Finally, Narvaez claims that the failure to interview Adrian Lopez ("Lopez"), a/k/a "Big Daddy", constitutes ineffective assistance of counsel because Lopez would have provided exculpatory testimony. Narvaez does not state what testimony Lopez could have provided. In the entire trial transcript (nearly 9,000 pages), no testimony links Narvaez and Lopez. Weinstein made a strategic decision not to call Lopez. Again, this decision by counsel is not unprofessional error.

### 2. *Claims by Feliciano*

Feliciano claims that Lee Ginsberg, Esq. ("Ginsberg"), provided Feliciano ineffective assistance of counsel. Feliciano specifically alleges that the failure of Ginsberg to call two witnesses, Rodriguez and Ms. Grecia Suarez ("Suarez"), entitles him to a new trial. The defendant claims that these witnesses would have provided exculpatory evidence, but Feliciano has presented no affidavits

from these individuals. These claims are meritless; Feliciano makes no showing of error by trial counsel and fails to show that these witnesses would have made any difference in the outcome of his trial.

Feliciano states that testimony from Rodriguez "would have established that Mr. Feliciano told Rodriguez that Quinones had given the [murder weapon Feliciano was arrested with] to the defendant one week before Mr. Feliciano's arrest and that Quinones had asked Mr. Feliciano to sell the gun for him. Rodriguez was further prepared to testify that he advised the defendant to return the gun to Quinones, and that he could be found at the Airborne building. This was the sole reason that Mr. Feliciano was at that building on the day of his arrest."

The Government would have objected on hearsay grounds to the admission of statements made by Feliciano. Even assuming that the Court would admit the substance of the proposed testimony, it is clear that the strategic decision of Ginsberg is not unprofessional error.

Ginsberg noted for the record that he considered the decision whether to call Rodriguez very carefully, and concluded following an interview with Rodriguez that it was best not to call him as a witness. Furthermore, Mitchell Golub, Esq., attorney for John Muyet, stated on the record that he was present during Ginsberg's questioning of Rodriguez and that he agreed with the decision. Rodriguez has a long criminal history and association with Feliciano, all of which would have served to harm the defendant.

This claim by Feliciano is a perfect example of the distorting effects of hindsight that the Supreme Court cautioned courts to avoid. Ginsberg clearly made a thorough investigation of the law and facts relevant to the plausible options, which make the strategic choice not to call Rodriguez virtually unchallengeable. "[T]he tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse of professional representation." *Schmidt*, 105 F.3d at 90; *see also Romero*, 54 F.3d at 60. Ginsberg's able counsel concerning Rodriguez was in no way incompetent.

Feliciano also claims that the decision not to call Suarez was ineffective assistance of counsel. Feliciano states that Suarez, the custodian in the building where Parrilla was murdered, would have testified that she often saw Parrilla enter the apartment building in the company of two men. She identified one of the two men as James Albizu, who testified for the Government. She did not recognize a photograph of Feliciano. The defendant claims that because Suarez would have testified that she had not seen him either in the building or with Parrilla, this would have raised reasonable doubt as to Feliciano's guilt.

Ginsberg spoke with Suarez and prepared for her to testify. After an effective cross-examination in which he exposed many flaws in Albizu's character and raised questions concerning his testimony, Ginsberg chose not to call Suarez. Suarez possibly could have added to the already significant impeachment of Albizu. However, her inability to identify Feliciano does not work to raise the reasonable doubt the defendant claims, and Feliciano overstates the value of her proposed testimony. Suarez did not say that she saw others enter the building with Parrilla that day, nor did she provide an alibi for Feliciano. Once again, Ginsberg made a thorough investigation of the relevant law and facts and determined not to call Suarez. This strategic decision is virtually unchallengeable. Based on the circumstances of the case at the time, the tactical decision to not call Suarez as a witness was not incompetent.

Besides failing to prove that the conduct of Ginsberg fell below an objective standard of reasonableness, Feliciano fails to show that the decisions not to call Rodriguez and Suarez prejudiced him. The Government presented convincing evidence against the defendant. Officers arrested Feliciano with the weapon used to kill Parrilla in his hand. Corona identified him as the hitman and as the person to whom Corona gave the gun. Corona also identified Feliciano as one of the attackers of the Salcedos. Finally, ballistics evidence tied Feliciano's gun to both the Parrilla murder and the Salcedo shootings, which Corona did not and could not have

known. The defendant does not show a reasonable probability that the result of the proceeding would have been different even if the complained-of conduct constituted unprofessional error.

## IV. RULE 34 MOTIONS OF NARVAEZ

Narvaez argues that this Court should arrest the judgment against him because the Court was without jurisdiction over the RICO and violent crimes in aid of racketeering counts of the indictment and an independent state ground for prosecution of his activities exists.

### A. *Standard for Rule 34 Motions*

 Rule 34 of the Federal Rules of Criminal Procedure provides that "[t]he court on motion of a defendant shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction." In deciding a Rule 34 motion, "A court may not look beyond the face of the 'record' which consists of 'no more than the indictment, the plea, the verdict . . . when the plea is "not guilty" . . . and the sentence . . . .'" *United States v. Stolon,* 555 F.Supp. 238, 239 (E.D.N.Y.1983) (quoting *United States v. Bradford,* 194 F.2d 197, 201 (2d Cir.1952)).

### B. *Narvaez's Claims*

In *United States v. Lopez,* 514 U.S. 549, 561, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court held that 18 U.S.C. § 922(q), which prohibited possession of a firearm in a school zone, violated the Commerce Clause because the prohibited activity did not affect interstate commerce. Narvaez complains that the RICO statute that served as a basis for two of his convictions similarly violates the Commerce Clause. This argument has no basis whatsoever.

 The *Lopez* Court contrasted § 922(q) with statutes that contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the [prohibited activity] affects interstate commerce." *Id.* at 561–62. The language of the RICO statute specifically contains such a jurisdictional element:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Likewise, the language of the violent crimes in aid of racketeering activity statute contains a jurisdictional element:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—. . . .

(b) As used in this section -

(2) "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate commerce.

18 U.S.C. § 1959.

The Supreme Court has reviewed RICO cases since *Lopez,* and has found no Commerce Clause problems. *See, e.g., United States v. Robertson,* 514 U.S. 669, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995). The Second Circuit has not yet faced a specific *Lopez* challenge to RICO, but when faced with a challenge to the Hobbs Act, the Court stated, "We find nothing in *Lopez* to suggest that the Court intended to heighten the threshold for establishing jurisdiction under [statutes which require a particularized showing of jurisdiction]." *United States v. Farrish,* 122 F.3d 146, 149 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1056, 140 L.Ed.2d 118 (1998)(No. 97–1136).

Judge John F. Keenan of this Court addressed a *Lopez* challenge to RICO, 18 U.S.C. §§ 1962(c) and (d), the violence in aid of racketeering statute, 18 U.S.C. § 1959, and the use of a firearm during and in relation to a crime of violence statute, 18 U.S.C. § 924(c), and held that those crimes "affect interstate commerce in a very real way. They interfere with persons, provisions of services, and other things which are related to and very much in interstate commerce." *United States v. Torres,* S2 94 Cr. 466(JFK), 1995 WL 459247, at *2 (S.D.N.Y. Aug. 2, 1995), *aff'd,* 129 F.3d 710 (2d Cir.1997). In its Opinion in *Torres,* the Second Circuit was not presented with a claim that the RICO statutes violated the Commerce Clause. However, the Court did determine whether § 1959, violent crimes in aid of racketeering activity, violated the Commerce Clause. The Court held that § 1959 is Constitutional, for there must exist a nexus between the act charged and interstate commerce before federal jurisdiction will attach. *See Torres,* 129 F.3d at 717. Thus, based on the language of the respective statutes and the case law developed subsequent to *Lopez,* it is clear that the RICO statutes and the violent crimes in aid of racketeering activity statute are within Congress's powers under the Commerce Clause and are Constitutional.

Narvaez also argues that because an "independent state ground" exists for the prosecution of these offenses, the Court must arrest judgment. This argument is completely meritless. A cursory perusal of Title 18 of the United States Code indicates that hundreds of federal laws exist that make certain activities criminal. Most if not all of these activities are likewise classified as criminal in the state systems as well.

The indictment in this case contains a proper jurisdictional element for each crime charged. The indictment therefore charges crimes over which this Court has jurisdiction, and this Court denies Narvaez's motion under Rule 34.

## CONCLUSION

For the reasons stated above, the defendants' motions pursuant to Rules 29, 33 and 34 of the Federal Rules of Criminal Procedure are HEREBY DENIED.

**SO ORDERED.**